See also, 5 Cir., 526 F.2d 1302.

UNITED STATES of America,
Plaintiff-Appellee,

v.

SEXTON COVE ESTATES, INC., et al., Defendants-Appellants.

No. 75–1638.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1976.

Michael D. Sikes, Robyn Greene, Miami, Fla., for defendants-appellants.

Robert W. Rust, U. S. Atty., Lawrance B. Craig, III, Asst. U. S. Atty., Miami, Fla., Wallace H. Johnson, Carl Strass, Eva R. Datz, Charles E. Biblowit, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BELL, AINSWORTH and DYER, Circuit Judges.

DYER, Circuit Judge:

Sexton Cove Estates (Sexton) and its former president Ralph Oesterle, appeal from the judgment of the district court requiring, because they had violated the Rivers and Harbors Act of 1899, 33 U.S. C.A. § 403, restoration, in varying degrees, of ten canals that they had dredged shoreward of the mean high tide line (MHTL) in Sexton Cove, a part of Blackwater Sound, in Key Largo, Florida, without a permit from the Army Corps of Engineers (Corps). The district court, 389 F.Supp. 602, ordered defendants to completely fill five plugged[1] canals, which had no connection with Blackwater Sound, and partially[2] fill five unplugged canals that physically connected with the Sound, and to replant the mangrove fringe along the banks of the restored canals. It also enjoined defendants from selling, conveying or disposing of any real property in the development without its approval.

Defendants contend (1) that the Corps lacks jurisdiction over the ten canals because they are above the MHTL; (2) that if the Corps has jurisdiction, there was no Section 403 violation; (3) that reliance upon internal Corps jurisdictional policy should be sustained as an affirmative defense; (4) that the restoration order was an abuse of the district court's discretion; (5) that individual lot owners are indispensable parties; and (6) that Oesterle may not be held personally liable for the restoration.

We agree with the district court that appellants reliance argument lacks merit and that the lot owners are not indispensable parties. We further agree that the district court had jurisdiction to grant restoration relief with respect to the unplugged canals connected to the Sound but remand for a further hearing on the appropriate relief. We find that the district court lacked jurisdiction with respect to the five plugged canals not connected to the Sound, and that the judgment against Oesterle cannot stand.

Sexton Cove Estates is a 73-acre mobile home development which fronts on Sexton Cove in Blackwater Sound. Blackwater Sound is navigable water of the United States. Oesterle was Sexton's President from 1970 to 1972, the time of the questioned activities.

Sexton purchased the land in 1969 and took immediate steps to develop it. Preliminary studies were made by an engineering firm in May, 1969. In February, 1970, a plat was prepared and filed in Monroe County, Florida, indicating the proposed construction of ten canals connecting to Blackwater Sound. Paving, grading and drainage plans were completed by March, 1970. Lots were first sold in 1969.

Sexton was advised by a representative of the engineering firm and informally, by an attorney familiar with Corps procedure that no permit was necessary since the dredge and fill activities would be shoreward of the mangrove fringe[3] in Sexton Cove. However, neither Sexton nor any of its advisors, sought the opinion of any Corps representative concerning the proposed construction.

On May 20, 1970, Sexton employed a contractor to perform the dredge and fill work on the canals. For convenience, we allude to the canals as one through ten. Canals one and two were excavated shoreward of the MHTL. Canals three, four and five were pre-existing

---

1. A "plug" is a strip of land separating waters from a navigable water.

2. Two of the canals were to be filled to a depth of 6 feet at the mouth sloping upward to a depth of 5 feet at the upland end. The other three were pre-existing canals which had been deepened and widened. They were to be filled to a depth of 10 feet at the mouth sloping upward to 6 feet.

3. The outer edge of the mangrove fringe was treated by the Corps as the MHTL, according to this advice. MHTL has never been so definitively established. See Gay, The High Water Mark: Boundary Between Public and Private Lands, 18 U.Fla.L.Rev. 553, 553–559 (1966).

canals which were deepened and widened by Sexton. They, too, are shoreward of the MHTL. Canals six–ten were excavated but plugged by "many"[4] feet of land.[5]

Canals one, two and three were completed and connected with Blackwater Sound by February, 1971, when Charles Allen, a field inspector of the Corps, visited Sexton Cove. Upon a subsequent search of Corps records, Allen determined that no dredging permit had been applied for by Sexton. As a result, on February 22, 1971, the Corps' resident engineer wrote to Oesterle to inform him that a permit was necessary for the excavation. Sexton responded on March 22, 1971, that it had been advised by counsel that no permit was required. On May 19, 1971, Allen returned to Sexton Cove and discovered that work was underway on canals four and five. These, as noted, were pre-existing canals which had connected to Blackwater Sound, but were plugged at this time in order to facilitate their widening, lengthening, and deepening.

On June 2, 1971, the Corps sent another letter to Oesterle which pointed out that the connection of the canals to Blackwater Sound without a permit was illegal, and no further connection should be made. On June 16, 1971, the Chief of the Corps' Operations Division also wrote to Oesterle telling him that a permit was required for the work at Sexton Cove.

The contractor left canals four and five plugged but they were unplugged in December, 1971. Canals six–ten were excavated after Allen's first visit but they have never been connected to Blackwater Sound.

On October 28, 1971, Sexton applied to the Corps for an after-the-fact permit. It was denied on June 12, 1973. Fourteen months later, the government filed this suit against Sexton and Oesterle.

Section 403 of the Rivers and Harbors Act makes it unlawful to

1) create an obstruction to the navigable capacity of any of the waters of the United States;

2) build any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, haven, harbor, canal, navigable river or other water of the United States outside of established harbor lines or where no harbor lines have been established; or

3) excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of any port, haven, harbor, canal, or of the channel of any navigable water of the United States,

unless the work has been approved by the Army Corps of Engineers.[6]

 The statute does not use the words "mean high water mark" or "mean high tide line." After the pas-

---

4. The record does not reflect how wide the plug is. Appellants say "many." The Corps refers to it as a "narrow strip."

5. Canal number one is over 600 feet long. Aerial photographs indicate that the other canals are approximately the same length. The depth of the ten canals range from 18 to 40 feet. The original depth of the canals which were deepened and widened (three, four and five) varied from 2–3 feet to 6–8 feet. The depth of Sexton Cove ranges between 4 and 5 feet.

6. Section 406 is one of the enforcement sections of the Act. It provides in pertinent part:

Every person and every corporation that shall violate any of the provisions of (section) 403 . . . of this title . . . shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said (section) may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

sage of the Act, the Corps apparently adopted the MHTL as a self-imposed jurisdictional boundary. Power, "The Federal Role in Coastal Development," ELI(ed.), Federal Environmental Law, 808–813 (1974); Hoyer, "Corps of Engineers Dredge and Fill Jurisdiction: Buttressing a Citadel under Siege," 26 Fla.L. Rev. 19, 25 (1973). That this occurred is not surprising. The MHTL traditionally had been the limit of admiralty jurisdiction in tidal waters. Waring v. Clarke, 1847, 5 How. 441, 463, 46 U.S. 441, 463, 12 L.Ed. 226. MHTL is also the boundary of tidal lands for property law purposes. Borax Consolidated, Ltd. v. Los Angeles, 1935, 296 U.S. 10, 22, 56 S.Ct. 23, 80 L.Ed. 9. Furthermore, promoting and protecting navigation was the dominant theme of the Act; [7] hence, there was "little need to focus attention on activities beyond the ordinary reach of the water." United States v. Holland, M.D.Fla.1974, 373 F.Supp. 665, 670.

There is, however, necessity for focusing on activities beyond MHTL today. Dredging or other activities may seriously "alter or modify" the course, condition, location, or capacity of navigable waters, yet take place just shoreward of the MHTL. Does mere location above MHTL insulate them from the Act's prohibitions?

The answer to this question, is rooted in traditional Supreme Court analysis of the scope of the federal authority over navigable waters. In United States v. Rio Grande Irrigation Co., 1899, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, the Court applied Section 10 of the Rivers

and Harbors Act of 1890, 26 Stat. 454, the predecessor to Section 403 of the 1899 Act. Defendant desired to build a dam across the Rio Grande River which the United States claimed would obstruct the navigable capacity of the river. Defendant argued that the river was not navigable in the New Mexico territory where the dam would be built and therefore the statute was inapplicable. The Court disagreed: "[a]ny obstruction to the navigable capacity, and anything, wherever done or however done, within the limits of the jurisdiction of the United States which tends to destroy the navigable capacity of one of the navigable waters of the United States, is within the terms of the prohibition." Id. at 708, 19 S.Ct. at 777.

The Court used the Hudson River as an example to illustrate when relief is available. The Croton River was a non-navigable stream which flowed into and contributed to the volume of the Hudson. "Unquestionably," said the Court, the state of New York had a right to appropriate its waters and "the United States may not question such appropriation, unless thereby the navigability of the Hudson be disturbed." (emphasis added.) The Court continued that if the state should, "even at a place above the limits of navigability, by appropriation for any domestic purposes, diminish the volume of waters which flowing into the Hudson, make it a navigable stream, to such an extent as to destroy its navigability, undoubtedly the jurisdiction of the national government would arise and its power to restrain such appropriation [would] be unquestioned." Id. at 709, 19 S.Ct. at 777. (emphasis added.) [8]

---

7. See Comment, Discharging New Wine into Old Wineskins: The Metamorphosis of the Rivers and Harbors Act of 1899, 33 Pitt.L.Rev. 483, 484–85, fn. 2 (1972); Rodgers, Industrial Water Pollution and the Refuse Act: A Second Chance for Water Quality, 119 U.Pa.L.Rev. 761, 772–774 (1971); but now see Zabel v. Tabb, 5 Cir. 1970, 430 F.2d 199, 201, cert. denied, 1971, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808.

8. Cf. United States v. American Cyanamid Co., 2 Cir. 1973, 480 F.2d 1132, 1135; United States

v. Esso Standard Oil Co. of Puerto Rico, 3 Cir. 1967, 375 F.2d 621, 623. The case law applying the so-called "Refuse Act," Section 13 of the Rivers and Harbors Act, 33 U.S.C.A. § 407 (which prohibits the discharge of refuse into navigable waters) consistently treats those indirect discharges merely onto land or onto a non-navigable water but which in turn are likely to wash into navigable waters as violations of Section 13. This liberal reading of that statute's scope has been specifically mandated by the Supreme Court for both Section

■ The Congressional grant under the Rivers and Harbors Act, of regulatory power to the Corps over navigable waters is the beneficiary of the same broadly reaching analysis. The local origin of the activity or the source of its operation is thus not wholly determinative; of at least equal significance is the "effect." *Zabel v. Tabb,* 5 Cir. 1970, 430 F.2d 199, 203, *cert. denied,* 1971, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808; *United States v. Underwood,* M.D.Fla.1972, 344 F.Supp. 486, 492. *See* Kramon, Section 10 of the Rivers and Harbors Act: The Emergence of a New Protection for Tidal Marshes, 33 Md.L.Rev. 229, 242, n. 72; Power, Federal Environmental Law, *supra,* at 794–796.

There has been no case resolving the question of the Corps' jurisdiction shoreward of the MHTL. In this Circuit, *Tatum v. Blackstock,* 5 Cir. 1963, 319 F.2d 397, and *United States v. Joseph G. Moretti, Inc.,* 5 Cir. 1973, 478 F.2d 418 (*Moretti I*) are cited to us but neither is dispositive. In *Tatum,* we held that a Corps permit was necessary before submerged land may lawfully be filled or excavated "if the area is navigable, or if the proposed work would affect nearby navigable waters." *Tatum v. Blackstock, supra,* at 399. However, the challenged activities occurred below MHTL there. In *Moretti I,* although we stated that the Corps had no power landward of MHTL to regulate Moretti's conduct or force reconstruction of the topography, the challenged activities had occurred below MHTL. In neither *Tatum*

nor *Moretti I* was the Corps' jurisdiction shoreward of MHTL in issue.

The Second Circuit has held that a Section 403 obstruction may be caused directly in navigable waters or indirectly by activity upland which creates the obstruction. *United States v. Perma Paving Co.,* 2 Cir. 1964, 332 F.2d 754. There was no dispute over jurisdiction:

"[P]lainly there is not one rule when a riparian owner discharges solids from his property into the stream and a different one when he places such excessive weight on the property as to cause the soil itself to move into the bed of the stream."

332 F.2d at 757. *See also United States v. Banister Realty Co.,* Cir.Ct.E.D.N.Y., 1907, 155 F. 583, 597.

■ With this background we examine Section 403. We find no locality assigned to its prohibitions. It prohibits any obstruction to navigable capacity. There is no suggestion that an obstruction whose source is above MHTL escapes prosecution. *United States v. Perma Paving Co., supra.* It prohibits the alteration or modification of the course, condition, location or capacity of a navigable water. There is not the slightest intimation that an alteration or modification whose source is above MHTL is any less an alteration or modification. There is nothing in the language of the statute nor the logic of its implementation which creates this barrier beyond which the Corps is ubiquitously powerless.[9] Indeed, such a limitation would thwart the design of the statute.[10] We

10 and Section 13 of the Rivers and Harbors Act: "We read the 1899 Act charitably in light of the purpose to be served. The philosophy of the statement of Mr. Justice Holmes in *New Jersey v. New York,* 283 U.S. 336, 342 [51 S.Ct. 478, 75 L.Ed. 1104], that 'A river is more than an amenity, it is a treasure,' forbids a narrow, cramped reading either of § 13 or of § 10." *United States v. Republic Steel Corp.,* 1960, 362 U.S. 482, 491, 80 S.Ct. 884, 890, 4 L.Ed.2d 903.

9. *See* Power, Federal Environmental Law, supra, 808–813, for a history of the exercise by the Corps of its "geographical scope of authority," concluding about the vagueness and un-

certainty of this: "The very nature of dredging techniques may solve some of the doubt. It would seem virtually impossible to cut a boat basin or canal without taking at least one bite out of the bed under abutting tide waters. This one bite would seem to assure Corps' jurisdiction over the whole project." *Id.* at 812.

10. The Supreme Court has pointed out the contemporary significance of the historical origin of the Act. The statute was enacted in specific response "to *Willamette Iron Bridge Co. v. Hatch,* 125 U.S. 1, 8 [8 S.Ct. 811, 815, 31 L.Ed. 629,] where the Court held 'there is no common law of the United States' which pro-

conclude, then, that activities which occur shoreward of MHTL, absent Corps approval, may, within certain limitations, be within the prohibitions of the Act.

■ We now review those activities. We pause only briefly to consider the five canals which connect directly to Blackwater Sound.[11] The district court found that these canals alter the course of the Sound because they changed its shoreline. This finding is supported by the record. Cf. *Booker v. Rochelle*, 5 Cir. 1928, 23 F.2d 492. The canals serve also as access to the Sound for numerous lot owners whose boats affect the navigable capacity of the area. Hence, the Corps has jurisdiction over them.[12]

■ However, the Corps does not have jurisdiction over the construction of canals six–ten. They are landlocked.

Their creation did not affect the course, condition, capacity or location of Blackwater Sound. The district court's finding that it had jurisdiction has no evidentiary support and is clearly erroneous.[13] F.R.Civ.P. 52(a).

■ Both the Corps and the district court rely on the fact that these landlocked canals exhibit tidal fluctuations. The argument is that if they exhibit these fluctuations after they are dug, a permit was required to excavate them initially. However, exhibition of tidal fluctuation subsequent to excavation does not prove alteration or modification of course, condition, location or capacity.[14] If it did, every hole dug in South Florida would be within the Corps' jurisdiction. The Corps jurisdictional fingers do not reach that far.[15]

---

hibits 'obstructions' in our navigable rivers. Congress acted promptly, forbidding by § 10 of the Rivers and Harbors Act of 1890, 26 Stat. 426, 454, 'the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity' of any water of the United States." *United States v. Republic Steel Corp.*, 1960, 362 U.S. 482, 486, 80 S.Ct. 884, 887, 4 L.Ed.2d 903. Accordingly to effectuate this congressional intent, judicial construction of the statute has been consistently expansive:

> The void which was left by *Willamette Iron Bridge Co. v. Hatch, supra,* need not be filled by detailed codes which provide for every contingency. Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation."
> 
> *Id.*, 362 U.S. at 492, 80 S.Ct. at 890.

11. The Corps argues that the three pre-existing canals (three, four and five) were navigable waters and therefore a permit was required before dredging could begin. Although the argument is not unpersuasive, we do not reach it in light of our disposition of the case.

12. Appellants argue that they come within the grandfather clause of the Corps regulations, 33 CFR § 209.150(b)(2) which provides that no permit is required for work commenced in conformance with existing harbor line authority before May 27, 1970. The short answer to this argument is that no harbor line had been established. Section 209.150(c); *United States*

*v. Diamond*, 5 Cir. 1975, 512 F.2d 157, 159–60, *cert. denied*, 423 U.S. 928, 96 S.Ct. 275, 46 L.Ed.2d 255 (1975).

13. The Corps argues that a developer could easily thwart the permit procedure by building a canal, leaving only a small plug, and await nature's erosion of the plug. We will await the building of that canal. Suffice it to say that the plug here is not so gossamer: it remains intact after five years. Nor does the developer's plat which indicates a planned connection affect our resolution of the jurisdiction question.

14. Both the Corps and the district court appear to confuse the ebb and flow of the tide test of navigability with a determination of a Section 403 violation for "altering" or "modifying." The former has been used to determine if existing waters are navigable, thereby giving the Corps jurisdiction. But that is different from creating waters where none previously existed and which do not "alter" or "modify." This latter fact is the one which relates to this case.

15. Even the present regulations do not assert jurisdiction over construction of plugged, landlocked canals. Under 33 CFR § 209.-120(g)(11), a canal is subject to regulatory authority if, once built, it constitutes a navigable water or if it is connected to navigable waters in a manner which affect their course, condition, or capacity. In all cases, the connection requires a permit. When canal construction is planned but no connection is intended, a permit application is unnecessary. Cf. *United*

We turn now to appellants' reliance and indispensable party contentions. Appellants argue that they were "affirmatively misled" by Corps regulations and administrative practices which they interpreted to exempt them from the permit requirements. Their argument is without merit. Neither appellants nor any of their "advisors" contacted the Corps with respect to the Sexton Cove operation.[16] Furthermore, a large part of the dredging activity at Sexton Cove occurred after the receipt of the February 22, 1971, letter from the Corps which stated that a permit was required. These circumstances hardly make out a case of an "affirmative" effort by the Corps to mislead appellants. *See United States v. Sunset Cove,* D.Or.1973, 5 ERC 1029, aff'd, 9 Cir. 1975, 514 F.2d 1089.

[11] Nor do appellants stand on any more solid ground when they argue that individual lot owners are indispensable parties to this lawsuit. Rule 19, F.R. Civ.P. provides that a person must be joined as a party where the disposition of the action in his absence may:

(i) as a practical matter impair or impede his ability to protect that interest or

(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest.

With respect to (i), lot owners were not denied access to the Sound under the partial restoration order.[17] Appellants fare no better under (ii). They argue that if partial restoration is ordered they will face lawsuits for trespass and interference with riparian rights. The latter assertion is questionable.[18] In any event, this potential litigation does not demonstrate a "substantial risk" of incurring multiple or inconsistent obligations by reason of lot owners' interest so as to create Rule 19 indispensability.

Finally, the question of Oesterle's personal liability to pay the costs of any restoration ordered must be determined. A corporate officer may not be held civilly liable for a corporate violation of the Rivers and Harbors Act unless either the Act itself authorizes such liability, or there are sufficient allegations and proof to permit negation of the corporate form. The enforcement section of the statute, 33 U.S.C.A. § 406, does not provide that an officer of a corporation which violates Section 403 is personally liable on any subsequent civil judgment[19] obtained against the corpo-

---

States v. Banister Realty Co., E.D.N.Y.1907, 155 F. 583, 597:

"So long as the new inlet did not affect the navigable character of any of the waters, and so long as its excavation did not cause the washing out of sand or other material into the bay, its construction would not be affected by the provisions of the statute. But if such an inlet should be created, upon its completion it might constitute navigable water, and as such pass under the jurisdiction of the government, even though created through private property."

**16.** The omission of this procedure was unreasonable. If appellants had contacted the Corps they would have been able to find out precisely where the MHTL was situated, *see* fn. 3, *supra.* In addition, appellants would have ascertained whether the Corps considered any of the three pre-existing canals to be navigable waters of the United States. Admittedly two of these canals could be navigated before they were widened and deepened.

**17.** The range of depths of the canals according to the partial restoration order would be 5–10 feet, fn. 2, *supra.* Thus, the canals would be deeper than Sexton Cove itself, fn. 5, *supra.* The district court determined these depths without a hearing. While we are remanding on this point, *see infra,* there is no reason to believe that the lot owners' interests will be ignored by the district court in framing an equitable decree.

**18.** None of the riparian rights discussed in appellants brief—ingress, egress, boating, bathing, or fishing—are interfered with by the partial restoration order.

**19.** Had the government proceeded criminally against Oesterle, the result might have been different. *United States v. Park,* 1975, 421 U.S. 658, 670, 95 S.Ct. 1903, 44 L.Ed.2d 489. But compare § 406 with the more explicit language of 15 U.S.C.A. § 24 (corporate violation of the penal provisions of the antitrust laws is deemed to be also that of the individual directors and officers) and 15 U.S.C.A. § 78u(c)

ration.[20] And there were neither any allegations in the complaint[21] nor proof at trial[22] to warrant "piercing the corporate veil." The judgment against Oesterle cannot stand.

Because we have found that the creation of the five plugged canals was not within the Corps' jurisdiction, the district court's restoration order with respect to them is without foundation. With respect to the five canals that are within the jurisdiction of the Corps, we deem it necessary to vacate the partial restoration order,[23] and remand the case to the district court for a hearing on the question of relief. The full effects of any environmental disturbance are difficult to measure. Attempts to reverse such effects and restore the environment to its natural state carry with them no guarantee of success. Hence, any restoration plan must be carefully designed to confer maximum environmental benefits. At the same time, the law must be tempered with a touch of equity. *United States v. Sunset Cove, supra.* The degree and kind of wrong and the practicality of the remedy must be considered in the formulation of that remedy.

There is no doubt that the district court has powerful tools at its disposal in fashioning relief for violations of Section 403. *United States v. Moretti, supra* at 431. However, it is unclear from the record that the appellants were given an adequate opportunity before the district court to adduce evidence and present their contentions with respect to the restoration issue. Under these circumstances, and because of the uncertainty implicit in environmental rehabilitation, the parties should be afforded a hearing to fully develop the situation. We, of course, pretermit any views as to the reach of a restoration order that the district court may feel is appropriate after having heard the parties on this issue.

The judgment against Oesterle is reversed and judgment in his favor is rendered. The judgment requiring restoration of the plugged canals, six–ten, is reversed. The judgment requiring partial restoration of canals one–five is vacated and this cause is remanded for further proceedings not inconsistent with this opinion.

(any person who fails or refuses to answer any lawful inquiry or to produce documents, if in his power to do so, in obedience to a subpoena of the Securities and Exchange Commission is guilty of a misdemeanor).

20. Contrast § 403 with statutes which permit lawsuits against officers performing corporate acts. *See* The Securities Act of 1933, 15 U.S.C.A. § 77k (Purchaser of security who relied on registration statement which contained untrue facts or some material omission may sue signatories of statement, directors of the issuer at the time of filing, etc.) and The Interstate Land Sales Full Disclosure Act, 15 U.S.C.A. § 1709 (Purchaser of a lot who relied on a property report which contained untrue facts or some material omission may sue developer or agent). *See* also *McCown v. Heidler*, 10 Cir. 1975, 527 F.2d 204, 44 L.W. 2298 (officers and directors of corporate land developer civilly liable under Land Sales Disclosure Act).

21. *United States v. Lehigh Valley RR Co.*, 1911, 220 U.S. 257, 272–74, 31 S.Ct. 387, 55

L.Ed. 458; *Walkovszky v. Carlton*, 1966, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6.

22. *See National Labor Relations Board v. Deena Artware*, 1960, 361 U.S. 398, 403–04, 80 S.Ct. 441, 4 L.Ed.2d 400; *Anderson v. Abbott*, 1944, 321 U.S. 349, 361–63, 64 S.Ct. 531, 88 L.Ed. 793; *Chicago, Milwaukee & St. Paul Railway Co. v. Minneapolis Civic Assn.*, 1918, 247 U.S. 490, 498–502, 38 S.Ct. 553, 62 L.Ed. 1229; *United States v. Lehigh Valley RR Co., supra; Zale Corporation v. Federal Trade Commission*, 5 Cir. 1973, 473 F.2d 1317, 1321–22; *House of Koscot Development Corp. v. American Line Cosmetics*, 5 Cir. 1972, 468 F.2d 64, 65–67; *Berger v. Columbia Broadcasting System*, 5 Cir. 1972, 453 F.2d 991, 994–998, *cert. denied*, 1972, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89; *Quinn v. Butz*, 1975, 166 U.S.App. D.C. 363, 510 F.2d 743, 757–58. *See generally*, 1 Fletcher on Corporations, § 43 (1974).

23. See footnote 2, *supra.*