**UNITED STATES of America, Plaintiff,**

v.

**Calvin L. BAILEY and Billy C. Bailey, Individuals, d/b/a Little Rock Marina, Inc., a corporation, Defendants.**

**No. LR–C–77–240.**

United States District Court,
E. D. Arkansas, W. D.

March 14, 1979.

Walter G. Riddick, Asst. U. S. Atty., Little Rock, Ark., for plaintiff.

O. H. Storey, III, Hoover, Jacobs & Storey, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, Chief Judge.

This case was brought by the United States seeking injunctive relief against the owners of a marina on the Arkansas River at Little Rock, who were alleged to have constructed and maintained a breakwater dike in the navigable waters of the United States in violation of the Corps of Engineers permit, pursuant to 33 U.S.C. § 403, under which the construction of the dike was authorized. For the reasons set forth below, the United States is denied all relief sought and the case is dismissed.

The gravamen of plaintiff's action is defendants' failure to restrict the height of their dike to elevation 235 feet above mean sea level, that height being noted on the permit as the height of the proposed dike. The government contends that strict adherence to permit conditions is necessary to guard against the deleterious effects of cumulative but relatively insignificant incursions on these interests in navigable waters that the Corps of Engineers is charged with protecting. Defendants basically reply that the "height restriction" in the permit was never understood as such and that the Corps of Engineers, having tacitly, if not explicitly, "approved" the structure when it was built (at a height over 235 feet), is estopped to assert, after several years, non-compliance with the permit, especially because the "offending" part of the dike has no substantial or cognizable

effect on any of the Corps' legitimate concerns with the navigable waters.

Defendants at the outset of this case contended that the Corps was without jurisdiction to require a permit, and impose conditions thereby, for the construction and maintenance of the marina dike because the foundation of the dike was alleged to have been built above the "ordinary high water mark" on certain accretions near the river's edge. Defendants maintain that the scope of the Corps' authority to require permits under section 403 for such construction activity corresponds to the scope of the United States' navigational servitude, and that therefore the relevant inquiry in this case, jurisdictionally, would be the location of the ordinary or mean high water mark of the Arkansas River at the location in question. *See generally United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967).

> Section 403 provides in pertinent part: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any . . . breakwater, bulkhead, jetty, or other structures in any . . . navigable river . . . outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to . . . fill . . . the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

The Court concludes that the scope of the Corps of Engineers' authority under section 403 to regulate certain physical activities is not limited to those activities occurring or existing below the ordinary high water mark. In this case, the artificial raising of the ordinary water level of the Arkansas River by means of a series of locks and dams means that, naturally enough, the normal waters of the river cover much land that, with the river in its "natural" state, would be above the otherwise ordinary high water mark. Leaving this fact aside, however, the better reasoning is that, in any event, the Corps' authority under the second and third clauses of section 403 extends to the permitting of any of the named activities [1] the operational effect of which is, generally speaking, to create obstructions to navigable capacity, regardless of whether the physical location of the activity, in the main, is above the ordinary high water mark. *See United States v. Perma Paving Co.,* 332 F.2d 754, 757 (2d Cir. 1964); *United States v. Cannon,* 363 F.Supp. 1045, 1051 (D.Del.1973); *Sierra Club v. Morton,* 400 F.Supp. 610, 628–30 (N.D.Cal.1975); *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1298–1300 (5th Cir. 1976). *Cf. Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 750 (9th Cir. 1978).[2] The Court need not decide whether a conclusion that a particular activity *above* the high water mark does *not* create any obstruction to the navigable capacity of the river in turn divests the Corps of its permitting authority over that activity, since the reasonable conclusion that such an activity *could,* if not properly regulated, have an effect on the navigable capacity provides a sufficient basis upon which to assert permitting authority under

---

1. *See Wisconsin v. Illinois,* 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (1929).

2. The United States was at first willing to concede in this case that the Corps' jurisdiction under section 403 was commensurate with the scope of the navigational servitude, but the Corps' own regulations clearly assert a broader jurisdiction:

> "Structures or work are in the navigable waters of the United States if they are within limits defined in 33 C.F.R. 209.620 [defining

'navigable waters']. Structures or work outside these limits are subject to the provisions of law cited in paragraph (b) of this section [(b)(2) of which specifies the Corps' permitting authority under § 403] if those structures or work affect the course, location or condition of the water body in such a manner as to significantly impact on the navigable capacity of the water body."

33 C.F.R. § 209.120(3)(1)(i).

section 403.[3] In this case, the Corps reasonably concluded that the dike in question could have such an effect.

Whatever the proper factors may be to allow the Corps to conclude that a particular permit condition is necessary to safeguard against impermissible "obstructions to navigable capability," the Court is convinced that those factors are not present in this case, that the Corps is indeed estopped to assert a height violation of the permit in question, and that the Corps acted arbitrarily, capriciously, and abused its discretion in denying to defendants an after-the-fact permit or a modification of the extant permit incorporating the present height of the dike.

The essential findings of fact in this case are as follows:

1. The Baileys decided in late 1965 or early 1966 to construct dikes to form an embayment for the purpose of establishing their marina. They knew that the Arkansas River navigation project would raise the elevation of the river sometime in the fall of 1968. It was therefore the defendant's intention to complete their dike construction just before the elevation of the river was raised.

2. The dike has two portions, one extending from the bank perpendicularly into the river and the other extending from the end of the first part, paralleling the river bank. The dike was constructed for the most part upon accretions which had been established for several years.

3. The defendants applied for and received a permit in September, 1966, for the construction of the dike. At the time, the Corps of Engineers was encouraging the establishment of such facilities, and the formal requirements for submissions in support of applications were very few. The defendants did not employ experts to assist them in preparing their submissions and drawings.

4. The permit shows, on a cross-section, a top dike elevation of 235 feet. The Court credits the testimony of Mr. Calvin Bailey as to the manner in which he very casually established this figure. The Court also credits the testimony of the Baileys that they did not know and were at no time made aware that there were *any* height restrictions on the construction of the dike. In this connection, the Court further finds that the plaintiffs at no time informed or attempted to inform the defendants of any height restrictions—that is, prior to 1973— and in fact had no particular criteria for or interest in the establishment of a height limitation for this dike.

5. The defendants constructed the dike to near its present height by the summer of 1968. The Court is convinced from the photographs submitted, including those of Inspector Plunket, that it was obvious to anyone, and especially to any inspector for the Corps of Engineers, that the dike substantially exceeded the elevation of 235 feet in 1968. There probably have been increases, and perhaps decreases, in the height of the dike since that time as the defendants made further improvements and attempted to widen the dike.

---

**3.** Defendants also apparently contend that any question by the Corps of their conformance with the permit is not a legitimate inquiry because the Corps' regulations do not *require* a permit for the dike. 33 C.F.R. § 209.-120(g)(12)(vii) provides:

"Applications will generally not be required for work or structures completed before 18 December 1968, nor where potential applicants had received expressions of disclaimer prior to the date of this regulation; *Provided, however,* That the procedures of paragraph (g)(12)(i) of this section shall apply to all work or structures which were commenced or completed on or after 18 December 1968, and may be applied to all spe-

cific cases, regardless of date of construction or previous disclaimers, for which the District Engineer determines that the interests of navigation so require."

The disclaimer in the last clause of the regulation is sufficiently broad that the Court need not address the specific factual and legal questions attendant to a determination of the applicability at this date of the main clause of the regulation. The exclusion was not in effect during the permitting process in question here. The permit was sought by defendants and the section 403 authority was exercised in the issuance of the permit, and the cited exclusion does not alter the issues before the Court.

6. The Corps of Engineers did inspect the dike work upon the completion of the work and upon several occasions thereafter. They did not note any material departures from the plans or the permit. Upon final inspection in 1968, no objections were made and no action was taken by the Corps of Engineers, at least prior to 1973.

7. After the completion of the construction and after the elevation of the pool in 1968, the defendants obtained additional permits from the plaintiff for the construction of dikes, gasoline pumping facilities, the installation of power line poles, and the construction of a barge mooring facility. During the course of the processing of these additional permits, which included inspections, no objections were made to the height of the dike.

8. The defendants have spent considerable sums on the construction, maintenance and operation of the facility. In this connection, the Court credits the testimony of the defendants as to their actual expenditures in time, money and effort.

9. Agents and employees of the plaintiff, including inspectors, have visited defendants' facilities on innumerable occasions since the construction of the marina. In fact, the plaintiff has rented space from the defendants for several of its inspection boats.

10. No objection was made as to the height of the dike until September, 1973.

11. The structure as it existed in 1968, and as it has existed at all times subsequent thereto, and as it exists today, does not constitute in any significant way an obstruction to the flow, or to the capacity, of the river, or to navigation. Indeed, the effects, although measurable, are *de minimis*. This is practically conceded by the witnesses for the plaintiff. In fact it appears to the Court that the plaintiff is not that much concerned about the effect of this particular structure. It is more concerned with the principle involved and the potential cumulative effect of many structures in this particular stretch of the river.

12. There is a very difficult and serious question as to the *ordinary high water mark* at the point where the defendants' marina is constructed. Because the Court feels that the plaintiff has jurisdiction over this type of facility, whether it is constructed above the ordinary high water mark or below, it is not necessary to the Court to resolve that difficult issue in this trial. I will state that, on balance, it is more likely that the bottom of the dike was constructed at least in large part on land lying *below* the ordinary high water mark.

The Corps denied the defendants' application for an "after-the-fact" permit, which would allow the dike to exist as presently constructed. An evaluation of an application for an after-the-fact permit will follow the Corps' standard procedures. 33 C.F.R. § 209.120(g)(12)(iii). The Corps' general policies for evaluating permit applications state that the benefit that reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments, a balancing process that should reflect the national concern for both protection and utilization of important resources. No permit is to be granted unless its issuance is found to be in the public interest, and one relevant factor in this consideration is flood damage prevention. 33 C.F.R. § 209.120(f)(1). In addition, in evaluating a permit application, the Corps must also consider the probable impact of each proposal in relation to the cumulative effect created by other existing and anticipated structures or work in the general area. 33 C.F.R. § 209.120(f)(2)(iv). And further, the Corps' stated policy is to give favorable consideration, "in the absence of overriding public interest," to applications for boat docks for small boats (as is the status of the marina in question here). 33 C.F.R. § 209.120(g)(7). This policy further states that the Corps will encourage safety in location, design and operation of such small-boat docks, in part to ensure the facility's ability to withstand wave action. Presumably, this policy may best be effected by ensuring that the relevant dike height is sufficiently high to safeguard the small boats from wave action in reasonably expected high water conditions! The defend-

ants' marina, as a matter of undisputed fact, would not even be functionally viable if the dike height were at elevation 235, much less be protected from "wave actions."

The Court is not unmindful of the Corps' legitimate concern with the cumulative effect of many, relatively insignificant impacts on the navigable capacity of a river. In this case, the Corps professes concern that the extra material comprising the dike over the 235 foot level will be one more "object" displacing waters at flood stage, thus raising the overall water level in some minute degree. The Court does not denigrate the Corps' general concern with flood control, as part of the authority given it to safeguard the navigable capacity of navigable waters, and this concern, as stated, does include the concept of cumulative effects in such regard. But in this case, given the truly *de minimis* effect of the dike height over elevation 235 feet, the casual manner in which the 235 foot height "restriction" was adduced, the lack of the Corps' affirmative establishment, with reference to cumulative effects and flood control, of any height restriction, and the Corps' stated policy in favor of small boat facilities, it is beyond question that the Corps' decision that an after-the-fact permit would be against the public interest was an arbitrary and capricious decision, and an abuse of the agency's discretion. The defendants cannot be made the unreasonable object of a "get tough" permit enforcement scheme.

Of further note is that, strictly speaking, since the dike in this case was initially constructed and maintained under the authorization of a section 403 permit, the applicable provisions of the Corps' regulations at this juncture would in fact appear to be those relating to modifications, suspension or revocation of authorizations, 33 C.F.R. § 209.120(o), inasmuch as "reevaluations of permits to assure compliance with its purposes and conditions will be carried out as provided in paragraph (o)." 33 C.F.R. § 209.120(q).

Paragraph (o) provides, in pertinent part: "Modification, suspension or revocation of authorizations. (1) The District Engi-

neer may evaluate the circumstance and conditions of a permit either on his own motion or as the result of periodic progress inspections, and initiate action to modify, suspend, or revoke a permit as may be made necessary by considerations of the general public interest. Among the factors to be considered are the extent of the permittee's compliance with the terms and conditions of the permit; whether or not circumstances relating to the activity authorized have changed since the permit was issued, extended or revalidated, and the continuing adequacy of the permit conditions; any significant objections to the activity authorized by the permit which were not earlier considered; and the extent to which modification, suspension, or other action would adversely affect plans, investments and actions the permittee has reasonably made or taken in reliance on the permit."

Under these criteria, the Corps' insistence on defendants' compliance with a 235 foot dike level appears even more arbitrary and capricious. Every factor listed, on the facts of this case, is in favor of the defendants' position, and it is absolutely unreasonable for the Corps to insist that defendants remove the dike material down to the 235 foot elevation level. The regulation speaks in terms of equity and the Corps of Engineers comes to this Court seeking equitable relief. The conclusion that the Corps' action in this regard is arbitrary is therefore based in part on the equitable considerations of the parties' positions, and it is to the specific defense of equitable estoppel that the Court now turns.

Defendants contend that the Corps agent(s) responsible for inspecting the dike upon its completion in 1968 were obligated at that time to note any impermissible deviations from the permit conditions, and that the failure of the official(s) to object in any way constituted, under the applicable regulations, tacit approval of the structure by the Corps, upon which the defendants relied in subsequent years in investing great amounts of time and money in the continued maintenance and improvement of their marina.

The applicable regulations in 1968 stated:

"(m) Supervision of work and report. (1) District Engineers will supervise all work authorized under permits and will require that the work be conducted and executed in conformance with the approved plans. Such inspections as are necessary for this purpose must be made on timely occasions during construction, and such notices and instructions will be given permittees to insure that they do not depart from the approved plans. District Engineers will note at the expiration of the time limit of the permit or upon completion of the work if at an earlier date, whether the conditions have been observed and whether the structures or operations as completed are in accordance with the approved plans. If the work is in accordance with the approved plans, no report will be made. If the final inspection shows a material departure from the authorized plans, the District Engineer will call upon the permittee to furnish plans showing the work as actually constructed. Should there be noncompliance with the conditions of the permit, a demand for compliance should be made and consideration given to criminal or injunctive action under subparagraph (2) of this paragraph.

\* \* \* \* \* \*

"(3) It is not the practice of the Department of the Army to issue letters certifying that completed work conforms to the permit. That question is a matter of fact to be determined in case of controversy by the usual rules of court procedure."

33 C.F.R. § 209.130(m) (1968). *Cf.* 33 C.F.R. § 209.120(q) (1977).

It is abundantly clear to the Court that the Corps' failure in this case to object to the height of the dike upon inspection at the completion of the construction estops the Corps from later objecting to the height because such action would work a serious injustice against defendants who have reasonably relied to their detriment upon their authority to construct and maintain the dike. Given the good faith reliance of defendants, their good faith behavior in constructing the dike to its present height, and the thoroughly *de minimis* character of the permit violation, it is plain that, on balance, the equities are completely in favor of defendants. Those who seek equity must do equity. The government in this case is in no position to seek equitable relief, and such relief will be denied.[4]

This conclusion obviously in no way signals that the Corps always will be estopped to seek conformance with the conditions of a permit after the construction under the permit has been completed without the Corps' objection. No such automatic estoppel, requiring the Corps absolutely to object upon the conclusion of the final construction inspection or forever be barred from enforcing the permit conditions, would be justifiable. Rather, the facts and circumstances of *this* case establish the inequity of the Corps "enforcement" efforts, as set out above.

The government contends that it simply cannot be equitably estopped, that the sovereign, as a part of sovereign immunity, is not subject to principles of equitable estoppel.

Although the general statement is still made that there can be no estoppel against the government or its agencies, the courts have criticised and cut away at this notion in recent years. And it may accurately be stated that categorical denials of any estoppel defense against the government are, in the main, utilized by the courts quickly to dispose of an estoppel defense that, in a non-governmental case, would obviously be

---

4. In its complaint, the Corps of Engineers sought an affirmative injunction requiring the defendants to remove, at their expense, material in the dike down to the 235 foot level. By the end of the case, the government's prayer for equitable relief was altered to request that the defendants be enjoined from repairing the dike in the event of flood damage, in addition to a request that the Court "put the defendants on notice that, should circumstances arise in which it would be reasonable to require it, the dike may have to be removed on short notice, either by the defendants or by the government at the defendants' expense." All such relief is denied.

meritless. *See generally* Annotation, Modern Status of Applicability of Doctrine of Estoppel Against Federal Government and Its Agencies, 27 ALR Fed. 702, and cases discussed therein. A fair summary of the character of the estoppel argument in this case may be stated as follows:

"Estoppel or no estoppel against the government was traditionally, and in some cases still is, made to depend upon the distinction between performance of a governmental as distinguished from a proprietary function, and upon the agent's conduct as within or beyond the scope of his authority in a particular situation. In some recent cases, however, the courts have turned away from these traditional pigeonholes, and considered the basic question of what is justice in a particular situation, concerning themselves only with determining whether the proper elements of an equitable estoppel were present, and whether recognition of the equities to estop the government will harm the public's interests."

27 ALR Fed. at 710.

In this case, it is beyond question that all of the traditional elements of equitable estoppel are present and that the effect of an estoppel against the government, albeit that the government's function here is characterized most fairly as governmental, will not harm the public's interest or jeopardize the government's function under the policies of section 403. Justice clearly demands that the doctrine of equitable estoppel apply in this case. The Court should reiterate at this point the importance of the nature of the defendants' reliance on the Corps' apparent approval, upon inspection, of the dike as constructed, and the Corps' exercise, almost by default, of its governmental function with regard to securing appropriate restrictions on construction in the river in relation to flood control objectives: the defendants at all times acted in good faith reliance on the propriety of their dike construction, hearing no objections from the Corps in the face of the Corps' duty to inspect and, if necessary, object to non-compliance, and the Corps at the time basically was not even concerned with exercising its governmental powers with specific regard to any problem of flood water displacement by a dike of excessive height. And if the displacement of *this* dike's height over 235 feet arguably *is* a matter that, in concern for cumulative effects, could conceivably implicate some harm to the public's interest, a matter the decisive answer to which is not before the Court, it is perfectly clear that by no stretch of the imagination could the harm to the public interest flowing from this dike's height over 235 feet be said to rise above the truly *de minimis* level. The legitimate interest of the Corps to exercise its powers in the public interest and to effectuate the policies of Congress do not sanction or allow the capricious dealing with citizens as evidenced in this case. The Court is in no way ruling that the Corps cannot crack down on individually insignificant harms to the public interest because of their cumulative effect, but on the facts of this case the efforts come far too late and the harm caused thereby to defendants would be unjust

Judgment of dismissal will be entered accordingly.