UNITED STATES of America, Plaintiff,

v.

Helen S. MARTIN, as Executrix of the Estates of Luther C. Martin, M. D., deceased, Trolley Realty Company, Incorporated, and Helen S. Martin (Individually), Defendants.

Helen S. MARTIN, as Executrix of the Estate of Luther C. Martin, M. D., deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 76–2342–1, 77–1783–1.

United States District Court, D. South Carolina, Charleston Division.

June 1, 1981.

As Amended Aug. 31, 1981.

212

Jack L. Marshall, Asst. U. S. Atty., Columbia, S. C., for plaintiff.

Paul H. Infinger, Dowling, Sanders, Dukes, Novit & Svalina, Beaufort, S. C., for defendants.

## ORDER

HAWKINS, District Judge.

The above actions, consolidated by order of this court filed July 26, 1978, involve a pond or impoundment artificially created on the marshes of and adjacent to Lower Toogoodoo Creek, Charleston County, South Carolina. At the time of its construction, this pond or impoundment was owned by Trolley Realty Company, Incorporated (hereinafter "Trolley"), with Luther C. Martin, M.D. (deceased), acting on behalf of Trolley. The pond is now owned by Helen S. Martin, widow of Luther C. Martin and Executrix of his estate (hereinafter "Martin").

On December 9, 1976, Civil Action No. 76–2342–1 was commenced by the United States of America (hereinafter "United States"). By order of this court dated December 26, 1978, Trolley Realty, Incorporated, Helen S. Martin, Lisa Martin, Bruce Martin, Bradley Richardson & Mrs. Bradley Richardson were added as party-defendants. After the death of Dr. Martin, on May 8, 1980, Helen S. Martin was substituted as a party-defendant for Dr. Martin, and defendants Lisa Martin, Bruce Martin, Bradley Richardson and Mrs. Bradley Richardson were dismissed as parties to this action.

In its complaint, the United States alleges violations of the Rivers and Harbors Act of 1899, seeking injunctive and restoration relief and civil penalties pursuant to Title 33, United States Code Sections 403 and 407. A second cause of action pursuant to the Federal Water Pollution Control Act was withdrawn by the United States.

On May 8, 1980, Trolley and Martin filed their answer and counterclaim setting forth several defenses, including two counterclaims seeking monetary damages pursuant to Title 28, United States Code Sections 1346(b) and 2674. The United States filed its reply to these counterclaims on May 12, 1980.

Civil Action No. 77–1783–1, was commenced by Luther C. Martin, M.D., against the United States on September 6, 1977. Upon Dr. Martin's death, Helen S. Martin (hereinafter "Martin"), as Executrix of the Estate of Luther C. Martin, M.D., was substituted as party-plaintiff. This action seeks monetary damages pursuant to Title 28, United States Code Section 1346(b).

Cross-motions for summary judgment were filed in both actions in May of 1980. The parties stipulated that there were no genuine issues as to any material facts. The motions were supported by affidavits, answers to interrogatories, depositions, testimony and the pleadings. Depositions of the following persons, with attached exhibits, were submitted in support of these motions:

(a) George Huey     Director and State Conservationist, Soil Conservation Service, April 16, 1980

(b) H. Exo Hilton — Engineering and Soil Technician, Soil Conservation Service, August 2, 1978

(c) Andy Johnson — District Conservationist, Soil Conservation Service, April 15, 1980

(d) Col. William K. Brown — District Engineer, Army Corps of Engineers, March 26, 1980

(e) John Romanosky — Chief of Operations, Army Corps of Engineers, March 26, 1980

(f) Don Hill — Surveying Technician, Army Corps of Engineers, August 8, 1977

(g) Bob Riggs — Surveying Technician, Army Corps of Engineers, August 8, 1977

(h) Ben Gould — Environmentalist, Army Corps of Engineers, August 8, 1977

(i) Luther C. Martin, M.D. — Summerville, South Carolina, August 8, 1977.

Affidavits of the following persons were submitted with regard to the motions for summary judgment:

(j) W. T. Pope, dragline operator, who constructed the pond under the supervision and direction of H. Exo Hilton, Engineering and Soil Technician for the Soil Conservation Service;

(k) Edward B. Latimer, Esq., former Assistant Attorney General for the State of South Carolina;

(l) Robert H. Dunlap, Resource Geographer, South Carolina Wildlife and Marine Resources Department.

Testimony was presented before this court by the following expert witnesses pursuant to the direction of this court to submit evidence regarding the practicability and feasibility of any proposed restoration:

(m) John L. Gallagher, Ph.D., Associate Professor of Marine Studies, University of Delaware, for the United States;

(n) Charles M. Bearden, Biologist and Director of the Office of Conservation, Management and Marketing for the South Carolina State Wildlife and Marine Resources Department, for Martin and Trolley;

(o) William W. Neely, retired, United States Department of Agriculture biologist, for Martin and Trolley;

(p) Robert Frank, registered land surveyor, for Martin and Trolley.

Additional testimony was given by:

(q) Helen S. Martin, widow and Executrix of the Estate of Luther C. Martin, M.D.

The court made an on-site visit to the pond on January 30, 1981.

The issues for determination in these cases are:

(a) Will equitable defenses defeat a civil action by the United States for injunctive and restoration relief and civil penalties pursuant to the Rivers and Harbors Act of 1899?

(b) May a corporation or private citizen recover damages in an action against the United States if such damages result from negligent acts or omissions which subject such corporation or private citizen to mental suffering and anxiety, harassment and involvement in legal actions?

## FINDINGS OF FACT

1. At various times between 1963 and 1979, the Soil Conservation Service of the United States Department of Agriculture (hereinafter "SCS"), through the State Conservationist (hereinafter "Director"), was put on notice, both orally and by letter, by the State Attorney General's office that no work should be done below the mean high water mark of any navigable waters or tidewaters without first obtaining state and federal permits.

2. At various times between 1970 and 1972, the United States Army Corps of Engineers (hereinafter Corps), through its Chief of Operations, discussed with representatives of the SCS the responsibilities of

the Corps with reference to cooperation and enforcement of its functions, including the issuance of permits by the Corps for work to be done below mean high water.

The Director of the SCS was told by the Corps that some work being assisted in by the SCS might need permits under the Rivers and Harbors Act. As a result of these conversations, the Director instructed the area soil conservationists to inform the field employees and district conservationists of this possibility and have them instruct the landowners to contact the Corps of Engineers.

3. Despite this knowledge, the SCS did not develop a written policy with regard to salt marsh impoundments until June 30, 1977.

4. On or about January 1973, Dr. Luther C. Martin requested assistance for and on behalf of Trolley from SCS with regard to Trolley's farmland on the Lower Toogoodoo Creek. The specific request was with regard to drainage of the crop fields and salt water intrusion on the farm land from a drainage waterway during "spring" tides. As a result, a SCS technician specializing in engineering and soil conservation met with Dr. Martin and, after discussing the property matter, did a preliminary survey and prepared a plan map for drainage ditches and construction of a pond to stop the erosion. After some discussion between Dr. Martin and the technician, and after reviewing the plan map, Dr. Martin requested a cost estimate for the work.

5. The SCS technician later met at the site with W. T. Pope, a dragline operator with whom the technician had been associated in previous work. After the perimeter stakes were set by the technician and Pope for the pond, a price was arrived at for the pond construction.

6. The costs were approved by Dr. Martin after another review of the plan and

assurances that the SCS technician would supervise the work.

7. At or about the time construction commenced, Andy Johnson, the District Conservationist and supervisor of the SCS technician, met with Dr. Martin at the pond site. The conservation plan map prepared by the technician was approved by Johnson, as evidenced by his signature thereon. Sidi Limehouse, a SCS supervisor, also approved the agreement to do the work, and W. W. Neely, a SCS biologist, visited the pond during the proposed construction discussions.

8. Dr. Martin inquired of the SCS technician if any permits were required for the construction of the pond. The SCS technician did not advise Dr. Martin one way or the other.

9. Pond construction commenced in or about January, 1973, and was completed in April, 1973. Construction was by W. T. Pope, pursuant to the SCS Plan and under the supervision of the SCS technician. The technician visited the site approximately eighteen times during the construction period.

10. The United States Army Corps of Engineers, in December, 1974, served a Cease and Desist Order on Dr. Martin, complaining of excavation and fill below the local mean high water mark of six and four-tenths (6.4') feet.

11. In April, 1979, a topographic survey of the pond dike was made by the Corps referencing a National Oceanographic and Atmospheric Administration bench mark of six and seven-tenths (6.7') feet mean high water mark, which evidences that the southern portion of the dike meanders generally along the 1979 mean high water mark. No topographic information relating to mean high water mark is in evidence for the interior of the pond.

12. Testimony from witnesses present at the site prior to construction of the pond is to the effect that the site was generally above the reaches of normal tides and that only upon "spring" or full moon tides did tidal waters flow into a ditch, gutter, or waterway that existed within the interior of the pond site.

13. The pond is presently a habitat for a variety of fishes, birds, shell fish and other forms of marine life, and, with proper management, it is capable of serving as a valuable marine and wildlife estuary.

14. That any attempts at restoration of the site to its natural state would likely fail. The benefits which would accrue to the public by allowing the pond to remain, pursuant to a proper management plan allowing a seasonal migration of pond inhabitants to adjacent waters, would greatly outweigh the benefits of any attempts at restoration.

## CONCLUSIONS OF LAW

This court has jurisdiction of all parties and of the subject matter of these consolidated actions.

It is the position of the United States that the creation of the subject pond violated Title 33, United States Code Sections 403 and 407 (The Rivers and Harbors Act of 1899). The United States contends that the construction of the pond altered and modified the course, location, condition and capacity of the navigable waters of the Lower Toogoodoo Creek, and seeks the equitable remedies of injunction and restoration as well as civil penalties.

Martin and Trolley contend that the design, location, plans and construction of the pond were directed and supervised by the United States Department of Agriculture, Soil Conservation Service, an agency of the United States, and that any violation of the

Rivers and Harbors Act was due to the negligence of the United States. Martin and Trolley raise the defense of equitable estoppel to defeat the action of the United States and, further, seek damages resulting from the alleged negligence pursuant to Title 28, United States Code Sections 1346(b) and 2674.

It is undisputed that in January of 1973, the Corps of Engineers had authority pursuant to the Rivers and Harbors Act to regulate excavation and fill below the mean high water mark of tidal, navigable streams. There is also no dispute that the Lower Toogoodoo Creek adjacent to the subject property is a tidal, navigable stream. The actual location of the mean high water mark at the pond site prior to or at the time of construction of the pond is not clear. The Corps' Cease and Desist Order of December, 1974, cited a mean high water elevation of 6.4 feet; the April, 1979, topographic survey of the Corps established a mean high water elevation of 6.7 feet.

The court notes the general duties and responsibilities of the SCS in the prevention of soil erosion to preserve natural resources and to maintain the navigability of rivers and harbors, and further to enhance the protection of land. 16 U.S.C.A. § 590a *et seq.*

Within this framework of authority, the SCS has for many years provided various degrees of advice, supervision and, in some instances, financial assistance, to fulfill these duties and responsibilities.

This court is also aware of the great responsibility placed on federal agencies, including the Corps of Engineers, in policing and maintaining the navigational capacity of our waters for the use and benefit of the public. In this regard, the Corps is responsible for the investigation, recommendation, and issuance of permits for fill and excavation of the navigable waters pursuant to the Rivers and Harbors Act. The appropri-

ate remedy for violation of this Act is injunctive and restoration relief, as well as civil penalties under the proper circumstances. 33 U.S.C. §§ 403 and 406; *United States v. Joseph G. Moretti, Inc.*, 331 F.Supp. 151 (S.D.Fla.1971), *rev'd in part*, 526 F.2d 1306 (5th Cir. 1976).

Pursuant to its jurisdiction in 1973 the Corps could have required its permit for construction and fill below the mean high water mark which existed at that time. *Weiszmann v. Dist. Eng., U. S. Army Corps of Eng.*, 526 F.2d 1302 (5th Cir. 1976); *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976). If the pond was built above the mean high water mark which existed in 1973, however, then the Corps could not have required a permit because it would not have had jurisdiction. *See, Moretti*, 331 F.Supp. at 158; *Sexton Cove*, 526 F.2d at 1297. The only evidence in the record relating to the location of mean high water at the time of construction of the pond is from eyewitnesses. No surveys were performed in 1973 or prior to that time.

The SCS technician who designed and supervised the construction of the pond testified that the only area he estimated that may have been below mean high water was a small waterway which served as a drainage gutter, but that could only be determined by an accurate survey. Dr. Martin's deposition states that salt water flowed into the drainage ditch only on flood tides. W. T. Pope, the dragline operator, stated by affidavit that, based upon his observation and twenty-five years experience, the areas on which he constructed the dike were above mean high water. William W. Neely, former SCS biologist, testified that when he examined the site in late 1972, he observed a narrow "gut" or slough, about six feet in width, which extended a short way into the area being considered for the pond site. Mr. Neely stated that from observation of the vegetation, he felt that the gut might have some water in it on a normal tide.

The burden of proof is upon the United States to show that it had regulatory jurisdiction to maintain this action by evidence that there was excavation and fill below mean high water. One conclusive way to establish mean high water mark on a tidal, navigable stream is by a topographic survey referenced to an accurate tidal bench mark. Additional evidence, such as expert vegetation analysis, observation, soil analysis and photographs may serve to further determine the mean high water mark. *United States v. Cameron*, 466 F.Supp. 1099 (M.D. Fla.1978).

Examination of the Corps' 1979 topographic survey of the dike, six years after the pond was constructed, reveals that the dike meanders along the mean high water mark established at that time. The determination of the location of the mean high water mark in 1973, based on the testimony, is doubtful.

Assuming, but not concluding, that some portion of the dike and/or pond site was below mean high water at the time of construction, the issue arises as to whether Martin and Trolley have equitable defenses to defeat the relief sought by the United States.

Dr. Martin's deposition was to the effect that he knew of no other federal agency interested in the work recommended by the SCS, including the Corps of Engineers. He further testified that he inquired of the SCS technician if any permits were required. The SCS technician testified that he did not advise Dr. Martin one way or the other. This course of action by the SCS technician was contrary to the action recommended by the Director of the SCS to his subordinates to advise landowners to obtain Corps of Engineer permits if such were needed.

Although no such advice was given and no permit sought, the SCS took over the mechanics of staking and supervising the construction of the pond, with costs to be

paid by Trolley. The pond was completed in or about April, 1973. In December, 1974, approximately 20 months later, the Corps of Engineers served its Cease and Desist Order.

The United States Court of Appeals for the Fifth Circuit has dealt with several violations of the Rivers and Harbors Act. Although denying strict estoppel application, that Court has based its decisions on equitable principles involving a balancing of comprehensive evaluations of environmental factors with the practicalities of restoration. *See, Sexton Cove*, 526 F.2d at 1301; *Weiszmann*, 526 F.2d at 1304–5; *Moretti*, 526 F.2d at 1310. This court finds these cases persuasive.

The pond was built with the advice, design, and supervision of the United States Department of Agriculture, Soil Conservation Service, a federal agency. Even though several SCS employees were at the site at different times throughout construction, no advice or recommendations were given to stop the project until construction could be coordinated with other regulatory agencies.

While the Corps of Engineers has a legitimate concern that the effect of a structure placed below mean high water without prior approval may be detrimental to the surrounding waters and marshes, no such detrimental effect has been demonstrated in this case. In fact, the evidence is that the pond is itself an environmental ecosystem that serves as a nursery for many varieties of marine organisms which, under proper management, can be returned to the adjacent waters and marshes.

Further, the evidence is that any attempt at restoration by removal of all or a portion of the dike would likely prove unsuccessful since this pond has been in existence for approximately eight years. There is also a possibility that the entire area would become toxic to marine life. As has been pointed out in similar cases, attempts to reverse such effects and restore the environment to its natural state carry with them no guarantees of success. *See, Sexton Cove*, 526 F.2d at 1301.

This court does not condone the actions of persons who excavate and fill areas which are subject to the jurisdiction of federal agencies and for which permits are required in order to insure the public's welfare. In the instant cases, however, this court cannot find any convincing evidence that the public policy of the United States would be frustrated by allowing the continued existence of the pond. The pond has not been shown to materially alter or modify the course, location, condition or capacity of Lower Toogoodoo Creek. The requested injunctive and restoration relief sought for the assumed marginal encroachment, if any, of the pond must be tempered with equity. *See, Sexton Cove*, 526 F.2d at 1301; *Lazy FC Ranch*, 481 F.2d at 987–989; *Sierra Club v. Leslie Salt Co.*, 412 F.Supp. 1096 (N.D.1976); *Bailey*, 467 F.Supp. at 929; *United States v. Lewis*, 355 F.Supp. 1132 (S.D.Ga.1973).

As an additional defense to the suit by the United States, Martin and Trolley allege estoppel. This court is aware of the line of cases that have developed since 1950 establishing the proposition that estoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel. *See, Moser v. United States*, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951); *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973), Annot., 27 A.L.R.Fed. 702 (1976); *Shuster v. C. I. R.*, 312 F.2d 311 (9th Cir. 1962); *Brandt v. Hickel*, 427 F.2d 53 (9th Cir. 1970); *United States v. Bailey*, 467 F.Supp. 925 (E.D.Ark.1979). *Contra; Robinson v. Vollert*, 602 F.2d 87 (5th Cir. 1979); *Hicks v. Harris*, 606 F.2d 65, 69 (5th Cir. 1979). In connection with these holdings of the Fifth Circuit, *Cf., United States v. California*, 332 U.S. 19, 40, 67 S.Ct. 1658,

**218**

1669, 91 L.Ed. 1889 (1947); *United States v. Davenport,* 297 F.2d 284 (4th Cir. 1961); *United States v. Newport News Shipbuilding and Drydock Company,* 571 F.2d 1283 (4th Cir. 1978). However, having weighed the evidence and finding that the issues in these cases can be resolved on other principles as above set forth, the Court does not deem it necessary to address such additional defense.

■ It is, therefore, the finding of this court that, as to Civil Action No. 76–2342–1, the continued existence of the pond, subject to a reasonable management plan which would allow the seasonal entrance and exit of marine animals and fishes, with reasonable maintenance of any species inhabiting said pond, should be allowed, and that Martin and Trolley's motion for summary judgment with regard thereto be, and the same is hereby, granted.

■ As noted above, Martin and Trolley have asserted two counterclaims against the United States. First, they contend that they are entitled to be reimbursed by the United States for expenses incurred in the construction of the pond. This contention is premised on the assumption that the court would order the impoundment broken. The decision of this court to allow the continued existence of the pond renders this counterclaim moot. Martin and Trolley have also asserted a claim for damages pursuant to Title 28, United States Code Section 2674; and, in Civil Action No. 77–1783–1, Martin seeks damages pursuant to Title 28, United States Code Section 1346(b). The court finds that there is insufficient evidence upon which to base any award of damages and hereby dismisses these causes of action.

AND IT IS SO ORDERED.