# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1908

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Gary Bailey, | * | |
| | * | Appeal from the United States |
| Defendant, Third Party | * | District Court for the |
| Plaintiff/Appellant, | * | District of Minnesota. |
| | * | |
| v. | * | |
| | * | |
| Lake of the Woods County, | * | |
| | * | |
| Third Party Defendant/ | * | |
| Appellee. | * | |
| _____ | * | |
| | * | |
| Pacific Legal Foundation, | * | |
| | * | |
| Amicus Curiae – Amicus | * | |
| on Behalf of Appellant. | * | |

_____

Submitted: February 12, 2009
Filed: July 9, 2009

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Gary Bailey constructed a road on a parcel of wetlands in Lake of the Woods County (County), Minnesota, without obtaining a permit under Section 404 of the Clean Water Act (Act). The United States Army Corps of Engineers (Corps) ordered Bailey to restore the land to its previolation condition. Bailey refused, and the United States brought an action under Section 309(b) of the Act to enforce the restoration order and to enjoin Bailey from discharging further pollutants into the wetland. Bailey counterclaimed against the United States, alleging that the Corps did not have jurisdiction over his parcel of land and that its restoration order was arbitrary and capricious. Bailey sued the County in a third-party complaint, alleging that the County should pay to restore the land. All parties moved for summary judgment.

In a most comprehensive, thorough opinion (from which we have borrowed extensively), the district court[1] granted in part the United States's motion for summary judgment, finding that the Corps properly asserted jurisdiction under the Act and that its restoration order met the requirements of United States v. Sexton Cove Estates, Inc., 526 F.2d 1293 (5th Cir. 1976). United States v. Bailey, 516 F. Supp. 2d 998 (D. Minn. 2007). The district court dismissed Bailey's counterclaim against the United States and his third-party complaint against the County. Id. The district court subsequently issued a final injunction, ordering Bailey to restore the wetland at his own expense to its previolation condition. United States v. Bailey, 556 F. Supp. 2d 977 (D. Minn. 2008).

Bailey appeals, contending that the district court erred in concluding that the Corps has jurisdiction over his property, in granting summary judgment in favor of the United States, and in entering an injunction to enforce the restoration order. He also argues that the restoration order is arbitrary and capricious. We affirm.

---

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

## I. Factual Background

Bailey owns a parcel of land along the western shore of the Lake of the Woods (Lake), which is located in northern Minnesota. At issue in this lawsuit is a thirteen-acre site that consists of approximately twelve acres of wetland, as defined by the Corps.

In the early 1990s, Bailey considered developing the site and received a general permit from the Corps to excavate a harbor. The permit, however, excluded fills for commercial development or residential housing. In 1993, the Corps advised Bailey that the intended harbor was located on wetland and informed him that he would need additional permits to place dredged or fill material on the site. In 1994, after Bailey and a Corps official visited the site, the Corps suggested that Bailey hire a consultant "to help you delineate this highly diverse site and prepare the required application that was previously provided to you." The harbor project was eventually abandoned.

Bailey decided to plat the site for residential development and sell the lakeside property. The development was named Sunny Beach and consisted of fourteen lots, each having approximately 100 feet of lakefront. In 1998, Bailey hired Mark LaValla to build a road through the site to provide access to the lots. Bailey did not seek any permits from the Corps before LaValla began constructing the road.

LaValla cleared a roadway sixty-six feet wide and about a quarter of a mile long, running parallel to the Lake's shoreline. LaValla dug ditches on either side of the road and used the excavated material to build up the road. Before the road was complete, on June 11, 1998, employees of the local Soil and Water Conservation District visited the site and told LaValla that the road construction was not properly permitted and that he should stop construction, which he did. On June 15, 1998, a Corps employee visited the site with Bailey and several employees from the County and the Soil and Water Conservation District and instructed Bailey to do no more work on the road. About a week later, a representative from the Environmental

Protection Agency (EPA) told Bailey that the EPA would not pursue an enforcement action if Bailey stopped all work on the road until he obtained a proper permit.

On June 17, 1998, Bailey filed a Local-State-Federal Project Notification Form with the County wherein he proposed building an access road for logging on the site. Bailey believed that his application would be accepted, and he alleges that an official from the Soil and Water Conservation District told him that the Corps would approve the permit and that he should finish the road. Without waiting for a decision on his application, Bailey instructed LaValla to finish work on the access road. LaValla completed the road, topping the roadbed with 2000 square yards of gravel.

The Corps received a copy of Bailey's notification form on August 17, 1998, and treated it as an after-the-fact application for a permit under Section 404 of the Act. On September 17, 1998, after the road was complete, the Corps notified Bailey in writing that the work was done in violation of the Act, that his permit was incomplete, that no additional work should be done on the road without a permit, and that if his permit was ultimately denied, he would be required to restore the land to its previous condition.

Bailey intended to dedicate the road to the County so that the road would become public and be maintained by the County. Accordingly, the road had to be built to meet the County's road specifications. Bailey requested that the road be inspected, and by letter dated September 16, 1998, the County's highway engineer informed Bailey of his inspection and of certain improvements that were required to bring the road into compliance with County road standards. The highway engineer sent a second letter in November 1998, detailing specific recommendations and requiring that a $10,000 bond be posted to ensure that the road met County standards. In the spring of 1999, Bailey hired LaValla to complete the improvements, which included adding approximately 530 square yards of gravel to the road and replacing the culverts with new pipe. LaValla completed the work on the road that summer.

While the road was being completed, Bailey was also preparing to plat the site. In October 1998, shortly after he received the notice of violation from the Corps, Bailey filed an application with the County to plat fourteen residential lots on the site. The County's environmental services director recommended the approval of the Sunny Beach plat, and the County's board of commissioners approved the plat on December 22, 1998. Upon approval of the plat, the road became a public road, although the County disputes the nature and extent of its property rights.

On June 12, 2001, the Corps denied Bailey's Section 404 permit application.[2] On October 22, 2001, after a period of public notice and comment, the Corps ordered Bailey to restore the property at his own expense. The restoration order required Bailey to (1) remove the dredged and fill material used in construction of the road; (2) fill in the ditches with native, loamy soils; (3) seed the restored area with a specified seed mixture; and (4) control certain weed species for three years following restoration. Bailey refused to comply with the restoration order, and the United States brought this enforcement action.

Summary judgment was granted in favor of the United States, and Bailey was ordered to submit a proposed restoration plan. Bailey, 516 F. Supp. 2d at 1021. After an unsuccessful appeal to this court, Bailey submitted a proposed plan. The United States objected and submitted its own proposed plan. The district court ordered Bailey to restore the site at his own expense to its previolation condition in compliance with the restoration order the Corps issued on October 22, 2001. Bailey, 556 F. Supp. 2d at 983-84.

---

[2]Bailey appealed from the Corps' denial of the application for a Section 404 permit. Bailey v. United States Army Corps of Eng'rs, No. 02-639, 2003 WL 21877903 (D. Minn. Aug. 7, 2003). The district court affirmed, and Bailey did not appeal from the order affirming the denial.

## II. Issues on Appeal

Bailey raises the following arguments on appeal: (1) that the district court erred in applying Justice Kennedy's opinion in Rapanos v. United States, 547 U.S. 715 (2006), to determine whether the Corps had jurisdiction over the site and that even if Justice Kennedy's opinion controls, the Corps has failed to show that the wetland has a significant nexus to or is adjacent to the Lake of the Woods; (2) that the Corps' denial of the after-the-fact permit and its restoration order are arbitrary and capricious; and (3) that the district court abused its discretion when it approved the restoration plan.

### A. Summary Judgment and the Corps' Jurisdiction under the Act

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of any pollutant from any point source into navigable waters of the United States without a proper permit from the Secretary of the Army (through the Corps) or from the EPA. §§ 1311, 1342, 1344. The Corps and the EPA share responsibility for implementing and enforcing the Act's permit scheme for the discharge of pollutants into navigable waters, and the extent of the Corps' jurisdiction has been hotly contested in cases around the country. Bailey concedes that the gravel and fill he placed on the site to build the road constitute pollutants and that those pollutants were discharged from a point source. Bailey also concedes that he did not obtain a permit from the Corps. Bailey challenges the Corps' assertion of jurisdiction over the site, arguing that the land onto which he discharged the pollutants did not constitute "navigable waters" under the Act.

The Act defines navigable waters as "the waters of the United States, including the territorial seas." § 1362(7). The regulations promulgated by the Corps define navigable waters as "navigable-in-fact" or "traditionally navigable" waters and the wetlands adjacent to such waters. 33 C.F.R. § 328.3(a).

1. The Supreme Court's Opinions in Rapanos v. United States

In Rapanos v. United States, the Supreme Court addressed how the term "navigable waters" should be construed under the Act and the extent to which the term includes wetlands. All members of the Court agreed that "navigable waters" encompassed something more than traditional navigable-in-fact waters. 547 U.S. at 730-31 (plurality opinion); 767 (Kennedy, J., concurring); 788 (Stevens, J., dissenting). There was no majority opinion, with five justices concluding that remand was necessary for consideration of whether the wetlands at issue in Rapanos were "navigable waters" covered by the Act and whether the EPA and the Corps had impermissibly extended their regulatory jurisdiction under the Act. Justice Scalia wrote the plurality opinion, joined by three other justices; Justice Kennedy wrote a concurring opinion; and Justice Stevens wrote the dissenting opinion, joined by three other justices.

The plurality opinion limits federal authority over "navigable waters" to "those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." Id. at 742. The plurality test requires two findings:

> First, that the adjacent channel contains a 'wate[r] of the United States,' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins.

Id.

In his concurring opinion, Justice Kennedy rejected these two requirements as "unduly dismissive of the interests asserted by the United States in these cases" and recognized that the rationale for the Act's regulation of wetlands is the functions that wetlands perform in relation to the integrity of other waters—"functions such as

-7-

pollutant trapping, flood control, and runoff storage." Id. at 777, 779. Accordingly, Justice Kennedy determined that the government's jurisdiction under the Act extends to wetlands that "possess a significant nexus to waters that are or were navigable in fact or that could reasonably be so made." Id. at 759 (internal quotations omitted). "[W]etlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of the covered waters more readily understood as 'navigable.'" Id. at 780. A wetland would not satisfy Justice Kennedy's test if its effect on water quality were speculative or insubstantial. Id. Justice Kennedy also concluded that if the wetland is adjacent to navigable-in-fact waters, then the Corps "may rely on adjacency to establish its jurisdiction." Id. at 782.

The dissenters determined that to the extent the Act requires a significant nexus, the requirement "is categorically satisfied as to wetlands adjacent to navigable waters or their tributaries." Id. at 807. The dissent specifically noted that all four dissenters would uphold the Corps' jurisdiction in cases that satisfy either the plurality's test or Justice Kennedy's. Id. at 810 n.14. "[I]n these and future cases, the United States may elect to prove jurisdiction under either test." Id.

2. The Circuit Courts' Application of Rapanos v. United States

When a majority of the Supreme Court agrees only on the outcome of a case and not on the grounds for that outcome, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977) (internal quotations omitted). The Supreme Court has recognized that applying a rule of law from its fragmented decisions is often more easily said than done. Grutter v. Bollinger, 539 U.S. 306, 325 (2003); Nichols v. United States, 511 U.S. 738, 745-46 (1994). The Marks rule (the narrowest-grounds-rule) becomes problematic when "one opinion supporting the judgment does not fit entirely within a broader circle drawn by the

others." King v. Palmer, 950 F.2d 771, 782 (D.C. Cir. 1991) (en banc). Because there is little overlap between the plurality's and Justice Kennedy's opinions, it is difficult to determine which holding is the narrowest.

Of those circuit courts that have considered Rapanos, most have concluded that Justice Kennedy's opinion constitutes the narrowest holding. United States v. Robison, 505 F.3d 1208, 1221-22 (11th Cir. 2007); N. Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 999-1000 (9th Cir. 2007); United States v. Gerke Excavating, Inc., 464 F.3d 723, 724-25 (7th Cir. 2006) (per curiam). Thus if a wetland meets the substantial nexus test, the federal authority has jurisdiction to regulate the wetland under the Act. Rapanos, 547 U.S. at 780 (Kennedy, J., concurring). The Seventh and the Ninth have not foreclosed the possibility that the plurality's test might apply in some cases and have limited their holdings to the facts of the cases before them. N. Cal. River Watch, 496 F.3d at 999-1000 (stating that Justice Kennedy's concurrence provided "the controlling rule of law for our case" and that it is "the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases"); Gerke Excavating, 464 F.3d at 725 (stating that Justice Kennedy's test "must govern the further stages of this litigation"). The Seventh Circuit concluded that the narrowest opinion is the one least restrictive of federal authority to regulate and that "as a practical matter the Kennedy concurrence is the least common denominator." Gerke Excavating, 464 F.3d at 725. Similarly, the Eleventh Circuit determined that the narrowest grounds is the "less far-reaching (i.e., less-restrictive of CWA jurisdiction)" and that "Justice Kennedy's test, at least in wetlands cases such as Rapanos, will classify a water as 'navigable' more frequently than Justice Scalia's test." Robison, 505 F.3d at 1221.

The First Circuit has concluded that the Marks rule is unworkable as applied to Rapanos and has instead followed the dissent's instruction to find jurisdiction if either the plurality's test or Justice Kennedy's test is met. United States v. Johnson, 467 F.3d 56, 66 (1st Cir. 2006). The Sixth Circuit did not decide which test controls, concluding that jurisdiction in the case before it was proper under both the plurality's

and Justice Kennedy's opinion. United States v. Cundiff, 555 F.3d 200, 210-13 (6th Cir. 2009); see also United States v. Lucas, 516 F.3d 316, 327 (5th Cir. 2008) (concluding that the evidence presented at trial was sufficient to support all three Rapanos standards and upholding guilty verdicts of defendants convicted under the Act).

Bailey and amicus Pacific Legal Foundation argue that the controlling jurisdictional test is stated in the plurality opinion, and thus the wetland must have a continuous surface connection with navigable-in-fact water for the Corps to assert jurisdiction over the wetland. The United States urges us to adopt the district court's holding that the Corps has jurisdiction over the wetland if either the plurality's test or Justice Kennedy's test is satisfied. We find Judge Lipez's reasoning in Johnson to be persuasive, and thus we join the First Circuit in holding that the Corps has jurisdiction over wetlands that satisfy either the plurality or Justice Kennedy's test.

### 3. Justice Kennedy's Jurisdictional Test Is Met in this Case Because the Wetland Is Adjacent to Lake of the Woods

Justice Kennedy's opinion holds that when a wetland is adjacent to the navigable-in-fact waters, then a significant nexus exists as a matter of law.[3] Rapanos, 547 U.S. at 780 ("As applied to wetlands adjacent to navigable-in-fact waters, the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecological interconnection, and the assertion of jurisdiction for those wetlands is

---

[3]Bailey argues that adjacency of wetland to navigable waters alone is insufficient to confer jurisdiction on the Corps under Justice Kennedy's test and that the Corps must prove that pollutants from the road reached the Lake. Bailey relies on an opinion from the Ninth Circuit that was later superseded. N. Cal. River Watch v. City of Healdsburg, 457 F.3d 1023 (9th Cir. 2006) (superseded). The superseding opinion deleted the precise language on which Bailey relies and clarified that adjacency to a navigable-in-fact water is sufficient to confer jurisdiction. N. Cal. River Watch, 496 F.3d at 1000. We do not find the superseded opinion to be persuasive authority.

-10-

sustainable under the Act by showing adjacency alone."); see also N. Cal. River Watch, 496 F.3d at 1000 (noting that Justice Kennedy reaffirmed "that wetlands adjacent to navigable waterways are covered by the Act"). If the wetland is adjacent to non-navigable tributaries of navigable-in-fact waters, then the Corps must show that the wetland "significantly affect[s] the chemical, physical, and biological integrity" of the navigable-in-fact waters. Rapanos, 547 U.S. at 780.

Justice Kennedy found the Corps' definition of adjacent to be reasonable when applied to wetland adjacent to navigable-in-fact waters, 547 U.S. at 774, and the Corps defines "adjacent" to mean "bordering, contiguous, or neighboring." 33 C.F.R. § 328.3(c). The district court determined that the road was built on wetland adjacent to the Lake, which is undisputably a navigable-in-fact water, holding that "the Corps has presented evidence that the wetland on the Site extends to the edge of the Lake and is thus 'bordering' on or 'contiguous' to the Lake." Bailey, 516 F. Supp. 2d at 1007.

Bailey argues that the Corps has failed to meet its burden on summary judgment to show that the wetland at issue is adjacent to the Lake. Specifically, Bailey argues that the Corps has not shown that the fifteen-foot corridor closest to the Lake has wetland hydrology because it did not sample the soil saturation. Without wetland hydrology, the corridor cannot be deemed a wetland. Bailey also contends that a genuine issue of material fact exists as to whether the 100-foot corridor closest to the Lake is wetland because Gary Lockner, the County's environmental services director, testified in a related proceeding that it is not. We review *de novo* the district court's grant of summary judgment, affirming if there exist no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. In re Operation of Mo. River Sys. Litig., 421 F.3d 618, 628 (8th Cir. 2005); Fed. R. Civ. P. 56(c). To determine whether these corridors constitute wetlands, we review the definition of wetlands and explain the Corps' evaluation of the site.

The Corps defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that

under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). The Corps conducts wetland delineations to determine the presence and extent of wetland, using the criteria set forth in the 1987 Corps of Engineers Wetlands Delineation Manual (1987 Manual) and Corps' guidance interpreting the 1987 Manual.

In general, the 1987 Manual defines land as wetland when, under normal conditions: (1) the land is dominated by hydrophytic vegetation (plants that have the ability to grow, effectively compete, reproduce and/or persist in anaerobic soil conditions caused by inundated or saturated soil conditions); (2) the land has wetland hydrology (inundated or saturated to the surface for at least five percent of the growing season in most years); and (3) the land consists of hydric soils (soils formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part of the soil). The Corps uses defined field indicators to determine whether the land is wetland by investigating the plants, water, and soil.

To determine whether an area is dominated by hydrophytic vegetation, the Corps establishes at least one sample point within each plant community and surveys the herbaceous vegetation within a five-foot radius and the woody vegetation within a thirty-foot radius. The Corps consults a list of plant species published by the United States Fish and Wildlife Services, which assigns an indicator status to individual plant species reflecting their probability of occurrence in wetlands. Hydrophytic vegetation is present if greater than fifty percent of the dominant plant species are obligate wetland plants, facultative wetland plants, or facultative plants (excluding facultative negative).[4]

---

[4]Obligate wetland plants are those that occur almost always in wetlands under natural conditions (greater than 99 percent probability), but which may also occur rarely in nonwetlands. Facultative wetland plants occur usually in wetlands (greater than 67 percent probability), but also occur in nonwetlands. Facultative plants occur in both wetlands and nonwetlands.

To determine whether the land has wetland hydrology, the Corps requires either one primary indicator, such as direct observation of soil saturation within twelve inches of the surface, or two secondary indicators, such as the FAC-neutral test and local soil survey data. The FAC-neutral test uses vegetation as a secondary indicator of hydrology. If obligate wetland plants and facultative wetland plants outnumber facultative upland plants and obligate upland plants, then the sample meets the FAC-neutral test and tests positive as a secondary indicator of hydrology. The rationale is that obligate wetland plants and facultative wetland plants occur in wetlands 67 to 99 percent of the time. Facultative plants, which occur in both wetlands and nonwetlands, are considered neutral.

An interdisciplinary team consisting of Steve Eggers, a senior ecologist with the Corps; Rod Heschke, a soil scientist with the United States Department of Agriculture; and Kelly Urbanek, a senior project manager and biologist with the Corps, conducted field investigations to delineate the wetland at the site. Consistent with the 1987 Manual, they established at least one sample point where a change in soils, hydrology, vegetation, or topography occurred, which resulted in a survey of forty-six sample points along established transects. They sampled vegetation, saturation levels, and soil types, concluding that the wetland encompassed the entire site except for approximately 1.31 acres.

According to the expert report prepared by Eggers and Heschke, there is no upland border along the site's shoreline. Thirteen of the forty-six sample points were within 15 to 101 feet of the cut bank of the shoreline. All thirteen of these sample points were dominated by hydrophytes and had hydric soils. Eleven of the thirteen had saturated soils within twelve inches of the surface, a primary indicator of wetland hydrology. The twelfth met two secondary indicators of wetland hydrology, the FAC-neutral test and the local soil survey data. The thirteenth sample point lacked sufficient indicators of wetland hydrology. Eggers and Heschke concluded that the area surrounding the thirteenth point is drained by a preexisting ditch and does not constitute a wetland.

Although the Corps did not sample the soil saturation, a primary indicator of wetland hydrology, within the fifteen-foot corridor of land closest to the Lake, two secondary indicators—the FAC-neutral test and local soil survey data—were met. Eggers found that the FAC-neutral test was met in the fifteen-foot corridor based on his observation of the vegetation closest to the lakeshore. Eggers established three sample points at the fifteen-foot mark, and he surveyed the herbaceous vegetation within the five-foot radius of the sample points and the saplings and shrubs within the thirty-foot radius. Eggers observed no changes in vegetation between the Lake and the sample points at the fifteen-foot mark that would have necessitated further sampling and determined that the land closest to the Lake tests positive under the FAC-neutral test. The other secondary indicator was local soil survey data, which Heschke reviewed. Heschke concluded that the soils within fifteen feet of the Lake are hydric based on his observations of the site, the National Cooperative Soil Survey, and the prevalence of the hydric soils in the surrounding area. The Corps thus presented sufficient evidence to allow a factfinder to conclude that the fifteen-foot corridor closest to the Lake's shoreline consisted of wetland hydrology.

Bailey failed to rebut the Corps' evidence; he offered no expert evidence of the hydrological characteristics of the site, let alone the fifteen-foot corridor closest to the Lake. In his briefs and at oral argument, Bailey explained that the wetland at the site is a bowl shape, with the highest point being along the Lake. Bailey also argues that the drop between the Lake and the shore causes the water table to be drawn down, creating upland. Accordingly, his argument goes, the fifteen-foot strip of land is not wetland. Without competent evidence to contradict the government's expert evidence that the corridor constitutes wetland, however, we cannot make that leap.

Bailey also contends that the 100-foot corridor closest to the Lake is not wetland, but he has again failed to submit evidence sufficient to create a genuine issue of material fact. As he did before the district court, Bailey relies heavily on the testimony from Gary Lockner, the County's environmental services director, who opined in a state proceeding that the 100-foot corridor was upland and lacked wetland

hydrology. Bailey brushed aside the district court's ruling that the testimony was inadmissible hearsay, arguing that "in a motion for summary judgment all evidence can arguably be found to be hearsay." It was Bailey's responsibility to come forward with admissible evidence to survive summary judgment, yet Bailey has failed to overcome the barriers of the hearsay rule. See Plamp v. Mitchell Sch. Dist. No. 17-2, 565 F.3d 450, 460 (8th Cir. 2009) ("Plamp fails to overcome the hearsay rule, and, thus, the evidence cannot defeat summary judgment."); Sallis v. Univ. of Minn., 408 F.3d 470, 474 (8th Cir. 2005) ("The nonmoving party must show by admissible evidence that specific facts remain which create a genuine issue for trial."). Lockner's inadmissible testimony cannot be used to defeat summary judgment.

Even if we were to accept the testimony, Lockner's opinion remains unsupported and unreliable, for it was based on his assumption that the Lake had a drainage effect on the site. Lockner was not identified as an expert in this case, nor did he conduct a wetland delineation of the site. Instead, he apparently relied on the van Shilfgaarde equation to conclude that the 100-foot corridor lacked wetland hydrology.[5] Bailey has presented no evidence that it is appropriate to use the van Shilfgaarde equation to estimate the drainage effect of a natural lake, and Eggers testified that he thought it would be inappropriate to do so. Eggers had used the equation to estimate the drainage effect of the man-made ditch on the site, and he had never heard of its being used to determine the drainage effect of a lake. We cannot assume, as Bailey has asked us to do, that the Lake has a drainage effect similar to a ditch.

The Corps has submitted competent and extensive evidence in this case to show that the site is situated in a wetland adjacent to navigable-in-fact waters, whereas Bailey has failed to present contrary evidence sufficient to create a genuine issue of material fact that the land closest to the Lake is not wetland.

---

[5]The van Shilfgaarde equation is a method for calculating the lateral effect of a ditch on soil saturation. Eggers used the equation to estimate the lateral drainage effect of the man-made ditches on the site.

-15-

4.  No Abuse of Discretion in Admitting the Corps' Expert Evidence

Bailey argues that Eggers's expert opinion is not sufficiently reliable to meet the standard set forth in Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993), contending that the use of facultative plants as indicators of the presence of hydrophytic vegetation falsely indicates wetlands.[6]  We review the district court's decision to admit expert testimony for abuse of discretion, according it substantial deference.  Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir. 2006).

Federal Rule of Evidence 702 provides that an expert may testify if it "will assist the trier of fact to understand the evidence or determine a fact in issue."  The trial court serves as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Daubert, 509 U.S. at 589. Expert evidence is unreliable if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case.  Marmo, 457 F.3d at 757.

We find no abuse of discretion in the district court's consideration of the Corps' expert evidence.  Hydrophytic vegetation is one of three criteria the Corps uses to define wetlands.  Even assuming that facultative plants falsely indicate wetland vegetation, the land must also consist of hydric soil and have wetland hydrology to be considered a wetland.  Moreover, the Corps does not consider all facultative plants as indicators of hydrophytic vegetation; it excludes facultative negative plants, which indicate the drier end of the category.  The Corps found obligate wetland plants and facultative wetland plants at the site, both of which are much more likely to grow in

---

[6]Bailey also argued that the Corps' expert evidence was unreliable because the Corps did not consider the drainage effect of the Lake on the land closest to the Lake. We find this argument to be without merit.  As discussed in the previous section, Bailey did not submit any credible evidence to support his contention that the Lake has a lateral drainage effect on the site.

-16-

wetlands than nonwetlands. Accordingly, the district court properly rejected Bailey's challenge to the reliability of the evidence.[7]

## B. Restoration Order

Bailey does not challenge the substance of the restoration order and the work required therein. Instead, he argues that the restoration order is arbitrary and capricious because the Corps should have approved his permit application and allowed him to mitigate the damage, rather than denying his permit application and ordering him to restore the site. As indicated earlier, however, Bailey did not appeal from the district court's order affirming the Corps' denial of his 404(b) application. Bailey, 2003 WL 21877903.

In his reply brief, Bailey frames this argument as stating a violation of the Constitution's equal protection clause. Bailey argues that because the Corps issued a permit to the County for Sandy Shores Drive, the drive that Bailey's road would have extended, the Corps should have done the same for him. The district court dismissed the argument, holding that Bailey's equal protection claim failed because he did not show that he was similarly situated to the County or that the Corps' disparate treatment of the two lacked a rational basis.

Bailey has failed to convince us that the Corps' disparate treatment resulted in a violation of the equal protection clause. See Geach v. Chertoff, 444 F.3d 940, 945

---

[7]To the extent Bailey is challenging as unreasonable the Corps' interpretation of wetlands in the 1987 Manual, we note that Congress has mandated that the 1987 Manual be used until a final wetlands-delineation manual is adopted. Energy and Water Development Appropriations Act, 1993, Pub. L. No. 102-377, 106 Stat. 1315 (1992). We also defer to the 1987 Manual as the Corps' interpretation of its own regulation, for an agency's interpretation of its own regulation "is entitled to deference 'unless plainly erroneous or inconsistent with the regulation.'" Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 127 S. Ct. 2518, 2538 (2007) (quoting Auer v. Robbins, 519 U.S. 452, 461 (1997)).

(8th Cir. 2006) (equal protection standard under the Fifth Amendment). Bailey and the County are not similarly situated. In 2001, the County applied for an after-the-fact permit for Sandy Shores Drive, which was built partly on wetland. At that time, the road had been in existence for at least a decade[8] and served many long-time residents. Bailey, on the other hand, was notified by the Corps in 1993—five years before he began building the road and polluting the wetland—that a permit was required. Bailey was encouraged to hire a consultant to delineate the property and assist in the permitting process and was notified before, during, and after the road's construction that a permit was required. Given these circumstances, we conclude that the Corps had a rational basis to treat Bailey and the County differently.

C.  Permanent Injunction To Enforce Restoration Order

Bailey argues that the district court should not have entered the restoration order because genuine issues of material fact existed regarding his ability to pay for the restoration, his knowledge that the property was a wetland, and whether the County was the appropriate defendant. Bailey asserts that he should have been allowed to go to trial on these issues and that we should apply a *de novo* standard of review to the restoration order.

Bailey fails to recognize that he is appealing from a permanent injunction, the entry of which we review for abuse of discretion. Roach v. Stouffer, 560 F.3d 860, 863 (8th Cir. 2009); United States v. S. Inv. Co., 876 F.2d 606, 615 (8th Cir. 1989); see also United States v. Cumberland Farms of Conn. Inc., 826 F.2d 1151, 1164 (1st Cir. 1987) (reviewing for abuse of discretion district court's issuance of an injunction to restore wetland to its previolation condition). "A district court abuses its discretion

---

[8]The government did not give a record citation for its assertion that Sandy Shores Drive was built in 1978 and extended in 1985-86. Bailey relies on the year the most recent Sandy Shores addition was platted—1990—citing a letter from the County's assistant zoning administrator. For purposes of summary judgment review, we will accept Bailey's date.

when it bases its decision on a legal error or a clearly erroneous finding of fact." Roach, 560 F.3d at 863 (quoting Kennedy Bldg. Assocs. v. CBS Corp., 476 F.3d 530, 533 (8th Cir. 2007)); cf. Sexton Cove Estates, 526 F.2d at 1301 (setting forth legal standard to be followed in considering environmental restoration, vacating partial restoration order, and remanding to the district court for further proceedings).[9]

The Act authorizes district courts to issue injunctive relief for violations of § 1311(a). The district court analyzed the propriety of the permanent injunction and restoration order under the standard set forth in United States v. Sexton Cove Estates, Inc. Under the Sexton Cove Estates line of cases, the restoration plan must: "(1) be designed to confer maximum environmental benefits tempered with a touch of equity; (2) be practical and feasible from an environmental and engineering standpoint; (3) take into consideration the financial resources of defendants; and (4) include consideration of defendants' objections." S. Inv. Co., 876 F.2d at 615 (quotation and citation omitted). Bailey agrees with the government that the district court applied the correct legal standard, but he contends that further fact finding is required.

Bailey argues that there is no evidence in the record that he had the means to restore the wetland, but he has not argued that he is unable to pay for the work outlined in the restoration plan. At the summary judgment hearing, his attorney conceded that the cost of removing the road would be about the same as the cost of building it. Similarly, Bailey does not argue on appeal that he cannot afford the restoration, but rather contends that the district court should have required more evidence. If Bailey had wished to contest this factor, he should have submitted evidence to the district court. The finding that restoration was within Bailey's financial means was not clearly erroneous.

_____

[9]Bailey's argument confuses the grant of summary judgment with the issuance of injunctive relief. We note that if summary judgment had been improvidently granted, we would have vacated the permanent injunction. Mulcahy v. Cheetah Learning LLC, 386 F.3d 849, 852 (8th Cir. 2004) (citing Randolph v. Rodgers, 170 F.3d 850, 856 (8th Cir. 1999)).

Bailey also argues that he did not know that the site was wetland before or during the construction of the road. Civil liability under the Clean Water Act is strict, and the government was not required to show that Bailey knew that his act of building a road violated the Act. 33 U.S.C. § 1319 (b); see also United States v. Sinskey, 119 F.3d 712, 715-16 (8th Cir. 1997) (holding that the government did not have to prove that the defendant knew that his acts violated the Clean Water Act, but merely that he was aware of the conduct that resulted in the permit's violation). Even assuming that knowledge was required, the record supports the district court's finding that Bailey was well aware that he needed a Section 404 permit to place fill on the site. Again, we find no legal or factual error.

Finally, Bailey makes the equitable argument that the County should be required to pay for the restoration because (1) Bailey instructed LaValla to complete the road at the direction of the County; (2) the County was involved in the permitting process; and (3) the County owns the road. The district court examined each of these contentions, supporting its factual findings with citations to the record. The district court did not err in concluding that:

> An examination of the record demonstrates that Bailey's contentions are meritless. The undisputed fact is that, at all relevant times, Bailey and Bailey alone was the driving force behind the creation of the Road. It was Bailey's decision to clear the sixty-six-foot wide roadway through the wetland and build the Road. It was Bailey who hired LaValla to perform the work. It was Bailey who told LaValla to resume the work after LaValla had been told to stop. And it was Bailey who stood to profit from the construction of the Road.
>
> Bailey did have extensive interactions with the County, but the focus of those interactions was *not* on the Road's compliance or lack of compliance with federal environmental standards—something that the County had no authority to address. Rather, the focus of Bailey's interaction with the County was on getting the land platted and getting the County to take over responsibility for maintaining the Road. None of this makes the County responsible for Bailey's violations of the CWA. At every step of the way, Bailey was well aware, as he had been since at

-20-

least 1993, that he needed a Section 404 permit to place fill on the Site.
. . .

It defies belief that Bailey, after being told by the *Corps* to stop work on the Road until he got a permit from the *Corps*, would resume work on the road without checking first with the *Corps*. Thus, even under the most charitable reading of the record, Bailey cannot claim ignorance of the fact that any additional work would be at his own risk.

Bailey, 516 F. Supp. 2d at 1016, 1017. Bailey disputes the district court's interpretation of the facts and its conclusion that Bailey was solely responsible for the violations of the Act. The district court, however, correctly applied the law and relied on no clearly erroneous fact to reject Bailey's equitable argument. We find no abuse of discretion in the district court's order issuing a permanent injunction ordering Bailey to restore the wetland to its previolation condition.

## Conclusion

The district court properly found that the Corps had jurisdiction because the wetland at issue is adjacent to the Lake. We find no abuse of discretion in the district court's evidentiary rulings or its order enjoining Bailey to comply with the restoration order. Bailey has advanced no substantive arguments for the reversal of the district court's dismissal of his suit against the County based on his failure to assert a valid third-party claim. The judgments are affirmed.

_____