**HAWKES CO., INC., Pierce Investment Co., and LPF Properties, LLC, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, Defendant.**

**Civil No. 13–107 ADM/TNL.**

United States District Court, D. Minnesota.

Aug. 1, 2013.

Gregory R. Merz, Esq., and Nancy Quattlebaum Burke, Esq., Gray Plant Mooty Mooty & Bennett, PA, Minneapolis, MN, on behalf of Plaintiffs.

Daniel R. Dertke, Esq., United States Department of Justice, Washington, D.C., Friedrich A.P. Siekert, Esq., United States Attorney's Office, Minneapolis, MN, and Molly McKegney Hunt, Esq., United States Army Corps of Engineers, St. Paul, MN, on behalf of Defendant.

## MEMORANDUM OPINION AND ORDER

ANN D. MONTGOMERY, District Judge.

## I. INTRODUCTION

On July 9, 2013, the undersigned United States District Judge heard oral argument on Defendant United States Army Corps of Engineers' (the "Corps") Motion to Dismiss [Docket No. 11]. Plaintiffs Hawkes Co., Inc. ("Hawkes"), Pierce Investment Co. ("Pierce"), and LPF Properties, LLC ("LPF") filed this action seeking a declaratory judgment and injunctive relief to challenge a jurisdictional determination made by the Corps under the Clean Water Act ("CWA"). For the reasons stated herein, the Corps' motion is granted.

## II. BACKGROUND

Plaintiffs Pierce and LPF own a 530 acre parcel of land in Marshall County, Minnesota (the "Property"). The Property contains peat, and because peat forms in wetlands, the Property is necessarily considered a wetland. Am. Compl. [Docket No. 7] ¶¶ 6, 7, 27. Plaintiff Hawkes seeks permission to mine peat from the Property for use in the construction of golf greens. Hawkes is already mining peat from nearby land, and intends to pay royalties to Pierce and LPF in exchange for permission to expand its mining operation onto the Property. All three companies are closely-held corporations owned by members of the Pierce family, and Kevin Pierce is an officer in all of the companies. *Id.* ¶¶ 8, 32–33.

On March 20, 2007, Kevin Pierce, representing Hawkes, met with the Corps and the Minnesota Department of Natural Resources ("MDNR") to discuss Hawkes' plan to mine peat on the Property. On January 15, 2008, the parties met again. At this second meeting, Hawkes informed the Corps and MDNR that the high quality peat available on the Property could support Hawkes' mining operation for another 10 to 15 years. *Id.* ¶¶ 35–37.

The CWA prohibits the discharge of materials into "navigable waters," which is broadly defined as "waters of the United States." 33 U.S.C. §§ 1251(a), 1311(a), 1362(6). The Corps has interpreted the term "waters of the United States" to include wetlands adjacent to navigable waters. The Supreme Court has affirmed this interpretation. *See* 33 C.F.R. § 328.3; *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The Corps has authority under the CWA to issue permits for the discharge of dredged or fill materials into navigable waters, including wetlands. *See* 33 U.S.C. § 1344. The Corps has also promulgated regulations which govern its decisionmaking processes in connection with CWA permits. *See* 33 C.F.R. § 320.1, et seq.

Hawkes' intended mining operation involves the filling or discharge of materials onto the Property. As a result, in December 2010, Hawkes applied for a permit from the Corps to begin mining. In January 2011, the parties met to discuss Plaintiffs' plans. The Corps attempted to dissuade Plaintiffs from expanding their mining operations, in part by stressing the time and cost involved in the permitting process. Am. Compl. ¶ 40.

On March 15, 2011, the Corps by letter informed Hawkes it had tentatively determined that the Property was connected to Red River of the North, a "water of the United States," and thus regulated by the Corps under the CWA. Over the next several months, the parties met several times, and the Corps conducted a site visit of the Property. In connection with the permitting process, the Corps also requested Plaintiffs conduct a series of assessments relating to the Property, which Plaintiffs

estimate will cost about $100,000. Am. Compl. ¶¶ 41–46, Exs. A, B.

■ On November 8, 2011, the Corps sent Plaintiffs a preliminary version of its jurisdictional determination for the Property (sometimes referred to as the "JD"). The preliminary JD stated that CWA jurisdiction existed over the Property because it was a wetland connected to a "relatively permanent water," which in turn connected to the Red River of the North, a navigable water.[1] Plaintiffs responded by letter, arguing no jurisdiction existed because the Property did not connect to a "relatively permanent water." Am. Compl. ¶ 49.

On February 7, 2012, the Corps issued an Approved Jurisdictional Determination (the "Approved JD") in which it apparently abandoned the "relatively permanent water" rationale and instead concluded a "significant nexus" existed between the Property and the Red River of the North. An "approved jurisdictional determination" is the first formal decision the Corps makes with regard to jurisdiction, and it is appealable to a "Review Officer" within the agency. *See* 33 C.F.R. §§ 331.2, 331.3.

On April 4, 2012, in accordance with CWA regulations, Plaintiffs appealed the Approved JD to the designated Corps Review Officer. Am. Compl. ¶ 51. On Octo-

ber 24, 2012, the Corps issued an appellate decision in which it rejected several of the Plaintiffs' appeal arguments. However, the appeal concluded that the Corps had failed to evaluate the Property's chemical, physical, and biological effects on the Red River of the North, and thus had not established a significant nexus. As a result, the JD was remanded to the St. Paul District of the Corps for further factfinding. *Id.* at Ex. C.

On December 31, 2012, the Corps issued a Revised Approved Jurisdictional Determination (the "Revised JD") in which it again concluded CWA jurisdiction existed. *Id.* at ¶ 54. The Corps informed Plaintiffs that the Revised JD constituted the "final Corps approved jurisdictional decision," meaning no further appeals of jurisdiction could be taken. Cameron Decl. [Docket No. 13] Ex. 1. On January 11, 2013, Plaintiffs filed this action seeking review of the Revised JD.

## III. DISCUSSION

### A. Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure states that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The court construes the pleadings in the light most fa-

---

1. For jurisdiction to exist under the CWA, the wetland at issue must have some connection to a "traditionally navigable water." The nature of this connection is somewhat in dispute due to *Rapanos v. United States*, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006). In *Rapanos*, the four justice plurality opinion held that for jurisdiction to exist under the CWA, the wetland must connect to a traditionally navigable water by "relatively permanent, standing or continuously flowing bodies of water." *Id.* at 739, 126 S.Ct. 2208. Justice Kennedy, in a concurring opinion, wrote that jurisdiction exists if the wetland has a "significant nexus" to traditional navigable waters. *Id.* at 778, 126 S.Ct. 2208; *see also*

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001).

The Eighth Circuit Court of Appeals has held that either test can establish CWA jurisdiction. *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir.2009). The Environmental Protection Agency and the Corps have similarly issued informal guiding documents in which they have stated an intent to exercise jurisdiction under both tests. *See* U.S. Army Corps of Engineers, *Clean Water Act Jurisdiction Following U.S. Supreme Court's Decision in Rapanos* (Dec. 2, 2008), *available at* http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/cwa_juris_2dec08.pdf.

vorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. *Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir.1994) (citation omitted). And although the court may not consider matters outside the pleadings at this stage, "documents necessarily embraced by the complaint are not matters outside the pleading[s]." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir.2012) (quotation omitted).

## B. Review of Final Agency Actions

■ Under the Administrative Procedure Act (APA), "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. For an agency action to be considered "final," it must satisfy two conditions. First, the action must "mark the consummation of the agency's decisionmaking process," meaning it must be more than "tentative or interlocutory" in nature. *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quotations and citations omitted). Second, the action must be one "by which rights or obligations have been determined," or one from which "legal consequences will flow." *Id.* at 178, 117 S.Ct. 1154.

The parties do not dispute that Plaintiffs here could obtain judicial review by pursuing the permitting process, as Corps regulations expressly make the final permit decision reviewable under the APA. *See* 33 C.F.R. § 331.12. However, Plaintiffs argue that by itself, a jurisdictional determination qualifies as a "final agency action" subject to immediate judicial review.

## C. Judicial Review of Jurisdictional Determinations

Although no Eighth Circuit court has yet ruled on the issue, several other federal courts have held that a jurisdictional determination is not a "final agency action," and thus not subject to immediate judicial review. *See, e.g., Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586 (9th Cir.2008); *Greater Gulfport Props., LLC v. U.S. Army Corps of Eng'rs*, 194 Fed.Appx. 250 (5th Cir.2006) (unpublished); *Coxco Realty, LLC v. U.S. Army Corps of Eng'rs*, No. 3:06–cv–416–s, 2008 WL 640946, at *4–5 (W.D.Ky. Mar. 4, 2008); *Hampton Venture No. One v. United States*, 768 F.Supp. 174, 175–76 (E.D.Va.1991); *St. Andrews Park, Inc. v. U.S. Dep't of Army Corps of Eng'rs*, 314 F.Supp.2d 1238, 1244–45 (S.D.Fla.2004); *Child v. United States*, 851 F.Supp. 1527, 1534–35 (D.Utah 1994); *Lotz Realty Co. v. United States*, 757 F.Supp. 692, 695–98 (E.D.Va.1990); *Acquest Wehrle LLC v. United States*, 567 F.Supp.2d 402, 409–411 (W.D.N.Y.2008); *Belle Co., LLC v. U.S. Army Corps of Eng'rs*, No. 12–247–BAJ–SCR, 2013 WL 773730, at *2–4 (M.D.La. Feb. 28, 2013).

*Fairbanks* illustrates the above-cited cases' reasoning for denying judicial review of jurisdictional determinations. Like Plaintiffs in this case, the plaintiff in *Fairbanks* sought judicial review after the Corps issued an approved jurisdictional determination for the wetlands at issue. *Fairbanks*, 543 F.3d at 593–94. In deciding whether a jurisdictional determination is a "final agency action," the Ninth Circuit Court of Appeals found that while the first *Bennett* condition was satisfied, the second was not. The court also concluded that the jurisdictional determination did not impair the plaintiff's ability to seek judicial review through the permitting process. *See Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154; 5 U.S.C. § 704.

Considering the first *Bennett* condition, the Ninth Circuit held that the plaintiff's jurisdictional determination represented a consummation of the Corps' decisionmaking process. The court reasoned that

when the Corps issues a jurisdictional determination and upholds it on administrative appeal, the Corps itself treats the determination as "final" and will not reopen it absent new information supporting a revision. *Fairbanks,* 543 F.3d at 592. The Ninth Circuit also found that Corps regulations treat the jurisdictional determination as a separate administrative process from the subsequent permit decision, with the latter being initiated at-will by the permit applicant. Practically speaking, when an applicant requests a permit, his application does not reopen or otherwise disturb the Corps' earlier jurisdiction decision. *Id.* at 593. As a result, the *Fairbanks* court held that the jurisdictional determination satisfied the first *Bennett* condition.

However, the Ninth Circuit ultimately held that a jurisdictional determination was not a "final agency action"—and thus not subject to immediate judicial review—because it did not alter a party's rights or obligations. *See id.* at 591–94. A jurisdictional determination, the court held, "does not itself command [a party] to do or forbear anything; as a bare statement of the agency's opinion, it can be neither the subject of 'immediate compliance' nor of defiance." *Id.* at 591–92 (citation omitted). A finding of jurisdiction in this context, the court held, is akin to recognizing already-existing facts about the nature of the wetlands at issue. When the Corps finds jurisdiction, it "does not alter physical reality or the legal standards used to assess that reality." *Id.* at 594. In other words, the Corps' jurisdictional determination clarifies a plaintiff's position but does not alter it. As a result, the jurisdictional determination fails the second *Bennett* condition, and the determination is not subject to judicial review.

As part of its analysis, the Ninth Circuit briefly noted its holding did not impair the plaintiff's ability to challenge CWA juris-diction. *Id.* at 594–95. The plaintiff could still challenge jurisdiction when judicial review was appropriate, such as in connection with a permit application or an enforcement proceeding. *See id.* As a result, the plaintiff was not without "other adequate remedy in a court." *See id.;* 5 U.S.C. § 704.

### D. Plaintiffs' Appeal of the Revised Jurisdictional Determination

As discussed below, Plaintiffs' jurisdictional determination satisfies the first *Bennett* condition, but not the second.

#### 1. Consummation of the Agency's Decisionmaking Process

■ The Corps argues *Fairbanks* reached the correct end result, but disagrees with the Ninth Circuit's conclusion that a jurisdictional determination marks the consummation of the agency's decisionmaking process. Instead, the Corps urges the Court to view jurisdictional determinations as the beginning, or at least as some non-definitive, stage of the permit process. In response, Plaintiffs note that *Fairbanks,* a case on which the Corps relies, held that a jurisdictional determination was the consummation of a Corps decisionmaking process. Plaintiffs further argue the language of Corps regulations themselves indicate an intent to treat jurisdictional determinations as final.

Plaintiffs' jurisdictional determination marked the consummation of the Corps' decisionmaking process, and as such satisfies the first *Bennett* condition. Despite the Corps' argument to the contrary, the jurisdictional determination process is not—as this case demonstrates—necessarily contiguous with a permit application process. Here, Plaintiffs received the Revised JD but have not yet decided whether to pursue a permit. At this point, Plaintiffs could choose to abandon their mining

operation. If that were to occur, Plaintiffs would not have abandoned the administrative process at a midpoint. The Corps' jurisdictional determination would remain in place regardless of future operations, changes in ownership, or complete inactivity on the Property. The only ways in which the Revised JD could be altered would be if: (1) new information surfaced regarding the Property, or (2) a party later successfully challenged jurisdiction in connection with a permit application or enforcement action. The jurisdictional determination is thus a discrete decision.

The possibility of the Corps revising its jurisdictional determination does not, as the Corps urges, transform this determination into an advisory opinion. The Ninth Circuit in *Fairbanks* concluded that the possibility of new information arising did not suggest that the determination "might be subject to subsequent revision ... consideration or modification." *Fairbanks*, 543 F.3d at 592 & n. 4; *see also Coxco*, 2008 WL 640946, at *5 (holding jurisdictional determination may mark consummation of jurisdiction decisionmaking process). In other administrative and judicial contexts, a final decision may be reopened if new information comes to light. *See, e.g.*, Fed.R. Crim.P. 33(b)(1) (governing motion for new trial based on newly discovered evidence); 20 C.F.R. § 404.989 (allowing for reopening of otherwise final Social Security benefits decisions based on new evidence or showing of error). But, for very practical and equitable reasons, the chance of new information altering a final decision does not justify treating the decision as entirely advisory. That is also the case here.

The language of Corps regulations further supports this conclusion. The Corps concedes CWA regulations describe a ju-

risdictional determination as "a Corps final agency action." 33 C.F.R. § 320.1(a)(6). However, the Corps argues that this language does not mean the Corps views jurisdictional determinations as final for APA purposes, but rather only as "final" in the sense the public may rely on the determination.[2] *See* Final Rule for Regulatory Programs of the Corps of Engr's, 51 Fed.Reg. 41,206, 41,207 (Nov. 13, 1986). The Corps' argument, as Plaintiffs note, actually supports viewing jurisdictional determinations as the consummation of a decisionmaking process. If a jurisdictional determination is "final" in the sense the public may rely on it, the determination must be more definitive than an advisory opinion.

### 2. Determines a Party's Rights or Obligations

■ Although Plaintiffs' Revised JD may mark the consummation of a Corps' decisionmaking process, it does not determine Plaintiffs' rights or obligations, and thus does not satisfy the second *Bennett* condition. Plaintiffs argue *Bennett* stressed the practical nature of its articulated finality test, focusing on the legal consequences of the agency decision even if the decision itself did not expressly alter legal rights. *See Bennett*, 520 U.S. at 169–70, 117 S.Ct. 1154. Because the Corps has found jurisdiction, Plaintiffs argue, their options have narrowed to a set of difficult alternatives. Plaintiffs may proceed with mining and risk substantial liability; they may seek a permit through a lengthy and costly process; or they may abandon their mining plans altogether. As a result, Plaintiffs argue the Revised JD has materially altered their legal position. The Corps responds by arguing, as *Fairbanks*

---

2. This argument also reflects the overall regulatory scheme, as 33 C.F.R. § 331.12 states administrative remedies have not been exhausted for APA purposes until a final permit decision is reached under § 331.10.

held, that jurisdictional determinations do not alter a party's legal obligations so much as mark the boundaries for future decisions.

Plaintiffs' jurisdictional determination does not fix their rights or obligations. The Revised JD does not order Plaintiffs to take any kind of action. Although Plaintiffs may want to obtain a permit if they wish to expand their mining operations, the Corps has in no way obligated them to do so. *See Fairbanks,* 543 F.3d at 594; *St. Andrews,* 314 F.Supp.2d at 1244–45; *Belle,* 2013 WL 773730, at *4. While Plaintiffs do have a difficult choice to make regarding how to proceed, their options did not substantially change because of the jurisdictional determination. The Property is undisputedly a wetland, and it has a potential connection to a navigable water. The Revised JD did not change these physical characteristics. Nor did it affect the legal standards used by agencies and courts in determining where the CWA applies. Even if Plaintiffs had never approached the Corps, Plaintiffs would have still needed to decide whether to begin mining on a wetland possibly protected by the CWA or to pursue a permit. As a result, the Revised JD does not satisfy the second *Bennett* condition.

**E. Compliance Orders and *Sackett***

Neither Plaintiffs nor the Court have identified a single decision contrary to the holding of *Fairbanks* and the other cases cited above. However, Plaintiffs argue the Supreme Court's recent holding in

*Sackett v. EPA,* —— U.S. ——, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012), overruled these decisions.[3] Without obtaining a jurisdictional determination or permit, the petitioners in *Sackett* filled rocks and dirt onto part of their residential lot in preparation for building a house. In response, the EPA issued a compliance order in accordance with 33 U.S.C. § 1319.[4] In the compliance order, the EPA determined that the petitioners' property fell under CWA jurisdiction, and also that the petitioners had violated the Act. *Id.* at 1370–71. The petitioners sought review of the compliance order, arguing it was a "final agency action" under Chapter 7 of the APA and thus subject to judicial review.

The Supreme Court sided with the petitioners. The Court held the compliance order bore the hallmarks of a "final agency action" under the two *Bennett* conditions. First, the compliance order marked the consummation of the EPA's decisionmaking process, because the petitioners were not entitled to any further administrative review. *Id.* at 1372. Second, the compliance order determined the petitioners' rights and obligations. The order legally obligated the petitioners to "restore" their land in accordance with an EPA restoration plan, it required them to provide the EPA with access to the property, and it required them to provide EPA employees with "access and documentation related to the conditions of the site." *Id.* at 1371 (citation omitted). If the petitioners did not comply, they would immediately risk accruing substantial, daily penalties. *Id.*

---

**3.** The Court in *Belle,* 2013 WL 773730, at *4, specifically distinguished *Sackett,* holding jurisdictional determinations did not have the binding effect of compliance orders. Nevertheless, Plaintiffs argue *Belle* reached the wrong result, and that *Sackett* applies here.

**4.** The EPA and the Corps have concurrent jurisdiction to enforce the CWA. The EPA has the authority under the Act to issue compli-

ance orders, binding decisions which the EPA can then choose to enforce in court by bringing an enforcement action. *See* 33 U.S.C.§ 1319(a, b). Prior to *Sackett,* courts had held that a party subject to a compliance order had no judicial recourse until the EPA brought a civil action to enforce the order. *See, e.g., Hoffman Grp. v. EPA,* 902 F.2d 567, 569–70 (7th Cir.1990).

at 1372. In addition, the Court noted that Corps regulations made it substantially more difficult for the petitioners to obtain a permit after receiving a compliance order. *Id.* (citing 33 C.F.R. § 326.3(e)(1)(iv)).

### 1. *Bennett* Conditions Under *Sackett*

Plaintiffs argue the Revised JD satisfies the same criteria for a "final agency action" as the compliance order reviewed by the Supreme Court in *Sackett.* As a result, Plaintiffs argue the Court should extend *Sackett's* holding to apply to all final CWA jurisdictional determinations as well. The Corps responds that *Fairbanks* and the other above-cited cases have correctly stated the law, and that because jurisdictional determinations are distinguishable from compliance orders, *Sackett* should have no effect here. Plaintiffs are unable to demonstrate how *Sackett* applies to jurisdictional determinations.

As discussed above, the jurisdictional determination satisfies the first *Bennett* condition.[5] With regard to the second *Bennett* condition, however, Plaintiffs' Revised JD is distinguishable from the petitioners' compliance order in *Sackett.* The compliance order demanded the petitioners restore their property in accordance with a restoration plan set by the EPA,

and grant the EPA access to both the land and records at issue. *Sackett,* 132 S.Ct. at 1371–72. If the petitioners chose to disobey the compliance order, they risked accruing up to $75,000 per day in penalties, which the EPA could recover if it subsequently prevailed in an enforcement action. *Id.* at 1370.

As discussed above in Section III.D.2., Plaintiffs face no such obligations or changes in their rights as a result of their jurisdictional determination. Plaintiffs attempt to avoid this conclusion by arguing the threat of liability comprises a material change in their legal obligations, just as it did for the petitioners in *Sackett. See Sackett,* 132 S.Ct. at 1371. If Plaintiffs forgo the costly permit process and begin mining, they argue, they will face the risk of the Corps suing them. However, the compliance order in *Sackett* "started the clock" on the petitioners' exposure to liability, adding potentially tens of thousands of dollars per day in penalties pending restoration of the property. *See id.* In this case, the jurisdictional determination has not exposed Plaintiffs to liability, nor made any demands of them. And if an enforcement action was brought against them, Plaintiffs would not face substantial—and automatically accrued—liability for their actions.[6] Thus, the "specter of

---

**5.** Regarding the first *Bennett* condition, *Sackett* and *Fairbanks* actually adopt the same reasoning in concluding a compliance order and a jurisdictional determination mark the consummations of their respective decision-making processes. *Sackett* held the "mere possibility" of an agency revisiting and revising its original decision based on new information does not "suffice to make an otherwise final agency action nonfinal." *Sackett,* 132 S.Ct. at 1372. As discussed above, *Fairbanks* held in agreement on this point.

**6.** .At the hearing, Plaintiffs argued that proceeding without a permit when the Corps has already determined jurisdiction could put Plaintiffs at risk of steeper penalties and even

criminal liability if the Corps succeeded in an enforcement action, because violating the CWA after gaining knowledge of CWA jurisdiction could demonstrate Plaintiffs' bad faith. Whether a particular agency action may be used as evidence against a party in a subsequent proceeding does not amount to a change in that party's rights or obligations, nor is it fairly characterized as a legal consequence. *See Fairbanks,* 543 F.3d at 595 ("[T]he possibility that Fairbanks might someday face a greater risk of increased fines should it proceed without regard to the Corps' assertion of jurisdiction does not constitute a *legal* consequence of the approved jurisdictional determination.") (emphasis original).

potential liability" was much more concrete for the petitioners in *Sackett* than it is here. Pls.' Mem. Opp. [Docket No. 26] 23; *see Lotz*, 757 F.Supp. at 696 (holding the permitting process did not impose the sort of "immediate and devastating consequences" which might amount to a determination of rights or obligations).

Also unlike the petitioners in *Sackett*, Plaintiffs may pursue a permit without a disadvantage. The compliance order "severely" limited the petitioners' ability to obtain a permit from the Corps. *Sackett*, 132 S.Ct. at 1372. Here, the jurisdictional determination has not affected Plaintiffs' ability to pursue a permit. And Plaintiffs' description of the permit process as an unending, unreasonably expensive procedural nightmare is unpersuasive. Undoubtedly, pursuing a permit comes at a significant price, and it will take time before Plaintiffs may challenge the Revised JD through this process. But, as another court held in a relevant context, "[t]he possibility that an agency may make an error that is beyond the effective reach of a court is part of the price we pay for the advantages of an administrative process." *Thermal Ecology Must be Preserved v. Atomic Energy Comm'n*, 433 F.2d 524, 526 (D.C.Cir.1970). Although Plaintiffs might prefer a faster or less expensive way to challenge the Revised JD, the law views the permitting process as a proper procedural juncture to access judicial review in connection with the CWA. *See, e.g., Fairbanks*, 543 F.3d at 594–95.

### 2. Adequacy of Judicial Remedies

In addition to considering the *Bennett* conditions, *Sackett* also considered whether the petitioners were left without "other adequate remedy in a court." *Id.* at 1372 (quoting 5 U.S.C. § 704). Generally, the party seeking to alter wetlands subject to the CWA may seek judicial review by one of two methods. First, he may proceed with the planned development or other alteration without consulting the Corps or the EPA. The EPA may then choose to bring an enforcement action against him, which would bring the party into court. *See* 33 U.S.C. § 1319; 33 C.F.R. §§ 326.3, 326.5. The Court in *Sackett* rejected this option, holding that waiting to be sued while incurring potentially significant penalties was not a sufficient remedy. *See generally Sackett*, 132 S.Ct. at 1372–74.

Second, the party may apply for a permit from the Corps, and if the permit is denied through the administrative process, he may file suit. *See* 33 C.F.R. §§ 331.10, 331.12. The Supreme Court held that this was not an adequate remedy for the petitioners in *Sackett*, because the EPA, a separate agency, had already issued a compliance order. *Id.* at 1372 ("The remedy for denial of action that might be sought from one agency does not ordinarily provide an 'adequate remedy' for action already taken by another agency.").

Neither of these "dead ends" apply to Plaintiffs. First, unlike the petitioners in *Sackett*, Plaintiffs are not at the mercy of the Corps while they continue to accrue liability. On the contrary, Plaintiffs may choose if future administrative proceedings regarding the Property will occur and Plaintiffs will not accrue liability in the meantime. Unlike the petitioners, Plaintiffs have the ability to "initiate [the] process" which will bring them before the Court. *See Sackett*, 132 S.Ct. at 1372.

Regarding the second remedy, as noted, Plaintiffs have the unhindered option of pursuing a permit from the Corps. Both *Sackett* and *Fairbanks* viewed the permit process as a proper avenue after which judicial review of agency action under the CWA was appropriate. *See Sackett*, 132 S.Ct. at 1372; *Fairbanks*, 543 F.3d at 594–95; *see also Coxco*, 2008 WL 640946, at *5. *Sackett* found the permit process inadequate only because it would not serve to

remedy the compliance order already issued by the EPA, a separate agency. *Sackett*, 132 S.Ct. at 1372. In this case, Plaintiffs face no such dilemma.

Finally, Plaintiffs now have a third avenue to judicial review. If Plaintiffs choose to begin mining without a permit and the government issues a compliance order, Plaintiffs may, as a result of *Sackett's* holding, seek immediate judicial review of the compliance order and resolve the status of their operations. Because the Revised JD does not satisfy both *Bennett* conditions, and because Plaintiffs have "other adequate remedy in a court," the determination is not reviewable at this time.

**F. Ripeness**

Both parties offer brief arguments regarding why the doctrine of ripeness might also determine the outcome of this motion. Because the Court holds judicial review is not appropriate for the reasons stated above, it declines to reach the issue of ripeness.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss [Docket No. 11] is **GRANTED;** and,

2. All claims in the Amended Complaint [Docket No. 7] are **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**